CHARLES EVERETT and EDWARD I. FORD

*v.*

TRUSTEES OF THE FIRST PRESBYTERIAN CHURCH OF ASBURY PARK et al.

1. The session of a Presbyterian church, or the individual members thereof, as such, have no standing in a court of equity to call the incorporated trustees of the church to account for a breach of trust. That can be done only by a member or members of the congregation, all of whom constitute the *cestuis que trustent* of the corporation.

2. The Presbytery of which any particular Presbyterian church is a member has no jurisdiction to adjudicate upon the use of the parsonage or manse of the church, and cannot determine who shall or who shall not occupy and use the same.

3. The incorporated trustees of a Presbyterian society, whose members act as a standing committee of the congregation or parish, are bound to obey the

directions of the congregation duly given in parish meeting assembled, and can only be restrained from so doing by some member of the congregation whose rights as a minority of the congregation have been infringed by the action of the majority.

Bill for injunction.  Heard on bill and answers and order to show cause.

*Mr. James Steen,* for the complainants.

*Mr. Samuel A. Patterson,* for Mr. Widdemer.

*Mr. Albridge C. Smith,* for the church and for George A. Smock, defendants.

PITNEY, V. C.

This is, in substance and effect, a suit to recover possession of land, viz., a parsonage-house or manse, and lot.

The defendant, Howard T. Widdemer, is in possession by the permission and as the tenant of the defendant corporation, the Trustees of the First Presbyterian Church of Asbury Park, which holds the legal title to the same.

The ostensible ground for coming into a court of equity for relief is that the legal title is in the defendant corporation, and that it is guilty of a breach of trust in permitting the defendant Widdemer to remain in the possession of the premises ; and the prayer is for relief against such breach of trust by enjoining said Widdemer from longer remaining in the possession of the premises and the defendant corporation from permitting him there to remain.

No question was raised but that if there be such a breach of trust, and the complainants have standing in this court to complain of it, then they are entitled to the relief sought, and I shall assume, for present purposes, that such is the law of this court.  Of course there can be no other ground for coming to this court.

Two questions are raised by the record and were fully discussed at the argument.

*First.* Are the complainants, or either of them, entitled to a standing in this court for the purpose of calling the defendant corporation to account for breach of trust in the premises?

*Second.* If so, has there been any breach of trust?

As to the first question:

The complainant Edward I. Ford is an officer of the church society, which is Presbyterian in its organization, known as a ruling elder, and was, at the time of the filing of the bill, sole acting ruling elder of the church, all the others having been deposed by action of the Presbytery of Monmouth, of which the church, as a spiritual organization, is a part. The complainant Charles Everett is a clergyman of the Presbyterian denomination, a member of the Presbytery of Monmouth, and was appointed by that Presbytery to act as moderator of the session— a body composed of the several ruling elders—of the church while the pastorate was vacant. This was done in accordance with a rule of the Presbyterian church that a session cannot act as a court without the presence, if practicable, of a clergyman as a moderator. Ordinarily the pastor of the church is the moderator, but in the absence of a settled pastor it is the function of the Presbytery to appoint one to act as such. Mr. Everett is not a member of the congregation. The two compose, as they assert, the session of the church, and claim as such.

Let us now inquire as to the standing of these individuals, or either of them, in a court of equity to call the defendant corporation to account.

It is proper to observe, in entering upon this inquiry, that this court takes notice only of property rights, or, to use the language of Chief-Justice Redfield, in his note to *Hennessy* v. *Walsh, 15 Am. L. Reg. (N. S.) 264* (at *p. 277*): "And to this extent the cases all agree that it must be the unlawful infringement of some personal right of pecuniary value and of a character redressible in the civil courts, in order to justify their interference in matters professedly of ecclesiastical cognizance." It can be appealed to only to enforce such rights, and it takes no notice of ecclesiastical doctrines, organization or discipline, except so far as they, or either of them, may affect property

rights.   It follows from this consideration that the inquiry must be as to whether the complainants have any personal property rights of pecuniary value in the lands in question.

In the case in hand there is no pretence that either of the complainants has any right of occupation or personal use of the manse.   The only property right of that nature which either of them can have in any landed property of the church society is the right to use the church edifice as a place of worship.   This is the ordinary use made of houses of worship by attendants therein, and from the nature of the case there can be no other. It is a use which is common to all those entitled by law to worship in a particular edifice, and is not exclusive in its nature, but may be exercised by many persons at one time.   It is a beneficial use which, in legal contemplation, has a pecuniary value, and any person who has a right to such use is entitled to resort to the civil courts to protect it.

The manse or parsonage-house owned by a religious society stands upon different footing.   There is no right of use in common in that.   It is not a sacred building like a church edifice, but is, properly speaking, an endowment or source of pecuniary revenue to aid in support of the worship in the church proper.   Its use is not spiritual, but temporal.   Though it is ordinarily used as a residence for the pastor, there is nothing in its character or ownership to prevent its being used for other purposes as circumstances may render it profitable or beneficial. It follows that the only property right, legal or equitable, which any individual can have in such manse must be acquired either by a lease or grant from its legal or equitable owner—in this case the parish meeting or the trustees—or from the enjoyment, in common with other members of the society, of the benefit of the pecuniary income derived from its occupation.

Let us inquire whether the complainants occupy such position. It is a conceded proposition that the defendant corporation is not only in name but in fact a mere trustee.   It was organized under the first section of the "Act to incorporate trustees of religious societies."   *Rev. p. 958.*   In one aspect the trust upon which it holds the title to property is but a simple one—that is, it is not

accompanied with any right or power to use or dispose of the property otherwise than at the direction of the *cestuis que trustent.* *Morgan* v. *Rose, 7 C. E. Gr. 583; Worrell* v. *Presbyterian Church, 8 C. E. Gr. 96.* But while this is so, the act contemplates that the corporation shall not be a mere passive trustee, but shall perform certain active duties requiring the exercise of judgment and discretion, subject always to the direction of the *cestui que trust.* This is apparent from a perusal of the sixth and seventh sections of the act. And, in point of fact, such has always been the practice in Presbyterian societies in this state. Indeed, the trustees, besides forming a distinct corporate body for the purpose of holding the title to the landed property, also as individuals act as a standing committee of the society or congregation, with power to execute its will when properly expressed, in all matters relating to the temporalities of the society. *Worrell* v. *Church, 8 C. E. Gr. 96* (at *p. 105*); *Robertson* v. *Bullion, 9 Barb. 64* (at *pp. 101, 102*). In applying what is there said by the learned judge in his elaborate and carefully-prepared judgment, where all the authorities are collected, it must be borne in mind that, under the New York statute, a religious corporation is composed of all the members of the congregation, while in ours it is composed only of the trustees, who hold in trust for the congregation.

The defendant corporation, being a trustee merely, it follows that it must have a *cestui que trust* or *cestuis que trustent,* and the general rule is that only a *cestui que trust* can call a trustee to account for a breach of trust; and the breach of trust complained of must be one injurious in a pecuniary sense. It must affect a property right.

There may be and are certain public trusts which are subject to the visitation of some public functionary—in this state, under our form of government, the attorney-general. But no question of that sort arises here, as this trust is not of that nature. *Robertson* v. *Bullion, 9 Barb. 64* (at *pp. 87, 91*).

The lands in question were not given upon an express trust, but were conveyed by ordinary deeds of conveyance, without limitation, to the corporation defendant; and the character and

limitation of the trust are to be inferred from the circumstances. *People* v. *Steele, 2 Barb. S. C. 397.*

In order, then, to ascertain who are the *cestuis que trustent* in this case we must look to the organization and character of the corporation itself. The first section of the act under which it was organized and has been maintained provides that every " religious society or congregation " of Christians is authorized to assemble at their usual place of meeting for public worship, at any time by them to be agreed upon, giving ten days' notice &c., and

" when so assembled may by plurality of voices elect any number of the said society or congregation to be trustees; which said trustees and their successors in office thereby are constituted a body politic and corporate in law, by whatever name they shall assume."

The trustees having assumed a name, and duly certified the same under their hands and seals in the county clerk's office, become a corporation.

The only written indication in this case of the object and character of the corporation is found in the name " Presbyterian " and the fact that the society became a member of an association of Christian churches known as a Presbytery. We will have occasion to refer to the effect of that further on.

By the statute it is entitled to acquire, purchase, receive, have and hold any lands, tenements &c., and to sell, grant, assign, demise, alien and dispose of the same, sue or be sued, and make and use a common seal.

The same class of persons who originally assemble and elect trustees for the purpose of being incorporated, viz., the " *members of the said society or congregation,*" are authorized by the act to elect new trustees from year to year or from time to time. They are the creators from time to time of the line of succession and perpetuators of the corporation. *State* v. *Crowell, 4 Halst. 392* (at *p. 411*); see *Baptist Church* v. *Wetherill, 3 Paige 296.*

Church edifices in this country are usually erected by funds contributed without condition by persons who feel so disposed, and where, as in most cases, there is no permanent fund from

which an annual income is derived for the support of the public worship, it is supported by voluntary contributions, in the shape of pew rents or stated payments, or assessments on pews where pews are sold and owned by individuals; and these persons so contributing, either as pew-owners or pew-holders or voluntary contributors, are the ones who are entitled to vote for trustees, and are entitled to manage the temporal affairs of the church through their trustees acting as their committee. They are the persons for whom the trustees act, and it seems to me they are the *cestuis que trustent*, and the only *cestuis que trustent* to whom the trustees can be required to respond. They are the persons who are entitled to the use in common of the church edifice for worship and to the benefit of the revenues of the church to aid in the support of the public worship in the church edifice. They, and they alone, have a personal pecuniary interest in the church property.

All the ecclesiastical authorities hold that the "congregation" is composed of all—non-communicants as well as communicants—who contribute steadily to the support of divine worship in the particular church. *Hodge's Presby. Law (5th ed.) pp. 35 bottom, 37, 38, 40, 41; Moore's Dig. of 1886 pp. 404, 405, 855.*

It follows that the complainant Ford, who is admitted to be a member of the congregation, has a standing in this court to call the defendant corporation to account.

But counsel for the complainants at the argument expressly declined to put himself upon that ground, and said that he was instructed to claim the right for the complainants as constituting the session of the church. And that leads to the inquiry whether the session of the church, in its collective capacity, or its members, as such, have any property right in the revenues of the church.

That body is not a corporation, and hence has no standing as a body in any civil court. This consideration seems to be fatal to the idea that it can maintain a suit in a civil court; and if it cannot do so as a body, I am unable to see how its component members can have any standing as such.

But waiving that objection as being merely technical, let us look at the actual character of that body and its relation to the property of the society.

We have seen that the defendant corporation, which is the owner of the legal title, is by the statute and by universal usage invested with powers and duties of managing the temporal affairs of the church, subject to the direction of the members of the congregation who are its *cestuis que trustent*.   The session as a body is chosen by and represents only the communicants of the church, and not the whole congregation.   Its jurisdiction is wholly spiritual.   *Hodge's Presby. Law pp. 56, 74, 77, 132, 161, 165, 307.* As the trustees are a committee of the whole congregation, whose duty it is to manage their temporal affairs, so the session is a committee of the communicants to manage their spiritual affairs. It is defined in the ecclesiastical books, and is in fact a court or "judicatory" to decide in matters of conduct and discipline, and I am unable to see how it has, as a body, any right of use of a civil nature—a pecuniary right—in the church or its revenues. As a judicatory it is its duty to attend to the spiritual needs of the church during the vacancy of the pastorate, and to decide upon the qualifications of any pastor who is called temporarily to officiate in public worship.   It also has the right to determine upon the character and quality of all services held in the church, as to whether they are or are not religious and spiritual according to the tenets of the Presbyterian church.

It derives its power to judge and to act wholly from the consent of the members of the congregation, arising by contract among themselves.   They, by joining the society, agree to submit in all spiritual matters to the judgment of a committee chosen by themselves, called the session.   In acting, this committee performs a spiritual duty or service, and does not exercise a civil right.   At any rate, it has no power to enforce any of its judgments, except by spiritual discipline.   It is, as I have observed, a conventional court, analogous in its character to standing arbitrators.   This is the view of Chief-Justice Redfield, expressed in his note to *Gartner* v. *Pennick, 9 Am. L. Reg. (N. S.) 210* (at *p. 221*), and his view is adopted by Chief-Justice Fuller in his learned note to *Chase* v. *Cheney, 10 Am. L. Reg. (N. S.) 295* (at *pp. 314, 316*); and whatever of executive service it performs is done as the agent and servant of the congregation.

The position of the session may be likened to that of an architect in superintending the erection of a building, who, by the contract between the owner and the contractor, is empowered to determine all questions and to direct generally in the erection of the building. But that is a power conferred upon the architect for the benefit of the contracting parties, viz., the owner and the contractor; and in supervising the erection and deciding as to the character of the work he performs a duty, and does not exercise any civil right inherent in his office of architect other than what he derives from the contractual consent of the parties; and we all know that neither an architect nor any ordinary arbitrator has any civil right in the thing about which he judges; and, above all, neither has a right to go into a court of justice to enforce in his own name any of his decrees or decisions.

As I understand the usages of the Presbyterian church in this state, the management of the temporal affairs is not committed to the session, and if not to the trustees as a standing committee of the congregation, then it is committed to the deacons. But in this case it is undoubtedly committed to the trustees.

I can find no warrant or authority for any contractual powers in the session except where acting as the agents of the congregation by its authority. It is, as I have said, the duty of the session to determine upon the qualifications of a temporary supply and the character of any proposed services, and it usually employs, from week to week, a proper minister to fill the pulpit of a vacant church; but in so doing it acts by the implied authority and consent of the congregation and trustees, and it has no power to bind the corporation to pay for the services of a minister, or even a chorister, against the consent of the congregation. If the congregation, or trustees by direction of the congation, determine and decide that it is not expedient to open the church for public worship on any particular Sunday or occasion, and notify the session thereof, that body has no power to employ a minister for that occasion and compel the congregation to pay him for his services.

The trustees have, indeed, no right to close the church edifice against the spiritual authorities of the society unless authorized

Everett v. First Presbyterian Church.

thereto by the express direction of the congregation. *Morgan* v. *Rose, 7 C. E. Gr. 583.* On the other hand, the spiritual authorities have no right to open the church and use it for religious services at the expense of the congregation without their consent. *Hodge's Presby. Law pp. 39, 40; Moore's Dig. 1886 pp. 110, 475; Minutes of the General Assembly 1869 p. 270; Minutes of the General Assembly 1874 p. 84,* where is found this deliverance:

"On the respective rights of sessions and boards of trustees in regard to church and Sabbath-school property, the committee recommend the adoption of the following, viz.: 1. That the constitution of our church charges the session with the supervision of the spiritual interests of the congregation and all services and matters pertaining thereto ; and that any action by the board of trustees, *unauthorized by the congregation,* tending to annul or contravene in any way such supervision and control, is illegal and void. 2. That, as regards the *church building, Sabbath-school* and *lecture-room,* the trustees have no right to grant or withhold the use of either, against the wishes or consent of the session."

The last section is plainly subject to the same limitation as the first, viz., that the act be unauthorized by the congregation, which is superior to both session and trustees.

The session does, indeed, have the dispensation of certain funds, but they are always given to it for that purpose by the congregation, either by collections especially taken for that particular purpose, or by special appropriations made by the congregation in parish meeting, or by the trustees under direction of the congregation ; and whatever it does in the way of dispensing funds is by the consent, express or implied, of the congregation or trustees, and not by any power inherent in the session. It has no power against that consent to pledge the credit of the society for any purpose. Whatever it does in the way of judgment or executive action is done as the agent of and for the benefit of the congregation, and it has no civil power whatever to execute its decrees. *Hodge's Presby. Law p. 122.* It follows that neither the session as a body, nor the individual members thereof as such, have any right to a use of the church property which has a pecuniary value or is considered beneficial in a civil court. It is not a property right in any sense of the word.

In this connection one of the rules of procedure of the church is significant. It is laid down that in case of a dispute as to the use of the church edifice between the session and the trustees, the same must, in the first instance, be referred to the congregation. *Hodge's Presby. Law p. 40; Moore's Dig. pp. 109, 110.* The reason of this is obvious. The congregation is the superior of both the session and the trustees. The trustees represent the whole congregation, and execute its directions in all temporal matters; the session represents that portion of the congregation who are communicants, and are its self-constituted court in all spiritual matters; both derive their power and authority from the congregation. It follows that when the dispute, as here, is in effect between the session and the congregation, the former must yield, subject always to the right of the minority of the congregation to claim that the action of the majority is in contravention of the fundamental agreement between its members, which forms its constitution. The session cannot appeal to the civil courts against any action of the congregation.

If, then, it be asked wherein does the action of a session, or, indeed, any church judicatory of the Presbyterian church, one way or another affect property rights, the answer is that it has the power to determine, for the benefit of the congregation, whether or not any particular conduct or course of public worship or use of the church edifice is or is not in accordance with the creed and discipline of the Presbyterian church; and any member of a Presbyterian congregation has the right to come into a civil court for protection against the use of the church edifice which has been condemned by the church judicatory. And he has that right although he be in the minority, for it is a part of the contract between the members of a Presbyterian society that the church edifice shall be used for worship according to the tenets and discipline of the Presbyterian church, and any diversion from that use is an infringement of that contract, which the majority may not inflict on the minority. This is upon the precise principle that the minority in number and value of the stockholders of an ordinary trading corporation may come into this court and ask this court to restrain the majority from putting the property of

the corporation to a use other than that to which by the original contract it was devoted. See *Kean* v. *Johnston, 1 Stock. 401; Zabriskie* v. *Railroad Company, 3 C. E. Gr. 178; Black* v. *Joint Companies, 9 C. E. Gr. 455; Vail's Executors* v. *Central Railroad Co., 14 Stew. Eq. 1.*

This right of a minority of a religious society to thwart the will of the majority is not admitted by all courts. *Robertson* v. *Bullion, 11 N. Y. 243* (at *pp. 263, 265*); *Petty* v. *Tooker, 21 N. Y. 267; Miller* v. *Gable, 2 Den. 492; Burrell* v. *Church, 44 Barb. 282; Smith* v. *Nelson, 18 Vt. 509.*

In all the adjudged cases in which a court of equity has been successfully impleaded to restrain the action of the temporal authorities of a religious association it has been invoked at the instance of one of the members of that society. The spiritual officers of the society have sometimes been joined as complainants, but in all cases some individual member has been present as a complainant.

This is illustrated by the celebrated case of the Walnut Street Presbyterian Church in Louisville, Kentucky, where suit arose at first in the state and afterwards in the federal courts. In both instances the action was brought by individual members of the congregation, and the final decree in the federal court, which was affirmed by the supreme court, was in favor of individual members. *Watson* v. *Avery, ·2 Bush 332* (at *p. 343*); *Watson* v. *Jones, 13 Wall. 679* (at *pp. 694, 697*). In that case a majority of the session and a majority of the trustees had combined against the majority of the congregation. The latter procured action of the Synod, which resulted in the election of additional members of the session and trustees, which new members the old session and trustees refused to recognize. The state court held the action of the Synod in promoting the election void for want of jurisdiction, and decreed the possession and control of the church edifice to the old session and trustees. The federal court held that it could not go behind the action of the church judicatory, and decreed the right of the newly-elected session and trustees to direct the use of the church. See the decree, *13 Wall. 697* bottom *et seq.* The statement of Mr. Wallace, the reporter, at the

bottom of *page 681,* was not called for by the case, and is inaccurate unless confined to that particular case, where the church was organized under a special charter.

*Lynd.* v. *Menzies, 4 Vr. 162,* was an action by a minister of the Protestant Episcopal church, against a portion of the wardens and vestrymen, for damages for preventing his access to the church on Sunday for the purpose of officiating as a clergyman. His right to recover was put by the learned chief-justice upon the ground that by the constitution of the Protestant Episcopal Church in North America, the bishop had the absolute right to appoint a clergyman, and, when appointed, such clergyman has the right to officiate in the church on Sunday. His standing in that case was at least as strong as that of a pastor of the Presbyterian church who had been duly called by a vote of the congregation and installed as pastor of the church. The trustees in such case, as in *Morgan* v. *Rose,* would have no right, without special authority from the congregation, to exclude a Presbyterian pastor from officiating. The legal right of the clergyman in *Lynd* v. *Menzies* was said to be in the nature of an easement in the part of the church in which he performed his duty, and was likened by the chief-justice (at *p. 168*) to that of a pew-holder or attendant in the church for worship, about whose legal right there can be no question.

The case of *Whittaker* v. *Mitchenor, 10 Stew. Eq. 6,* was a bill in equity filed by a minister of the Methodist Episcopal denomination and certain members of the church, against the trustees, to enjoin them from locking the church on Sunday against the minister and the congregation. The trustees put their defence upon the ground that they were authorized and directed by a majority of the congregation to close the church against the pastor, Dr. Whittaker. He had been duly appointed according to the constitution of the Methodist Episcopal church to the pastorate of that congregation, and Chancellor Runyon held that the majority had no right to close the doors of the church against him when he wished to officiate on Sunday.

But here it will be observed that the complainants were not only the minister, but certain members of the congregation, representing, presumably, a minority thereof.

Neither of these cases militates against the general principle of law that only the members of the congregation, as the *cestuis que trustent,* have a right to a standing in a civil court to prevent a misuse of the property of the society.

The act of March 25th, 1881 (*P. L. of 1881 p. 256; Rev. Sup. p. 865*), recognizes this principle and attempts to create a standing in the civil courts of this state for the highest judicatory of the particular sect, which in this case is the General Assembly.

2. But admitting that the complainants, or one of them, have standing in some capacity for present purposes, let us inquire whether there has, in fact, been any breach of trust committed by the defendant corporation.

The following facts are clearly set forth in the bill and answers, which are called for under oath, that of the defendant corporation being under its corporate seal, and it was admitted by complainants' counsel that so far as the facts do not appear in the bill they are correctly set forth in the answers.

Shortly prior to the 1st of May, 1894, the settled pastor of the church had died and the pastorate was vacant; whereupon the session, by leave of the Presbytery, and by express direction of the congregation, employed the defendant Widdemer to supply the pulpit for six months from the 1st of May, at a salary of $100 per month, and he entered upon the service, but did not enter into or occupy the manse or parsonage prior to November 1st, 1894.

At a session of the Presbytery of Monmouth held on the 2d and 3d of October, 1894, that body directed the session of the church to discontinue the services of Mr. Widdemer until his credentials should be presented to the standing committee of the Presbytery and by them approved, and a special committee was appointed to visit the church and explain the action of the Presbytery; and it was further resolved that *the request of the session of the defendant church to supply the pulpit for the next six months be granted,* and that the Rev. Charles Everett (one of the complainants herein) be moderator of the session of said church while it is without a pastor.

Later, on October 17th, the Presbytery passed this resolution :

33

"The question of the continued employment of the Rev. Howard T. Widdemer by the session of the First Church of Asbury Park, having been long and faithfully considered, the matter appears so complicated and doubtful that we are convinced the best interests of that church will be promoted by his no longer serving them as their minister, and so affectionately but firmly direct them to discontinue his services."

And the services were discontinued temporarily.

On the 27th of October the session of the church, being petitioned in writing by a majority of the congregation for that purpose, called a meeting of the congregation to be held on the 29th of October, for the purpose of considering the then existing posture of affairs in said church and to arrange for the supply of the pulpit. This was strictly in accordance with Presbyterian practice. The congregation met on that day and the following resolution was unanimously adopted :

"*Resolved*, That in view of the faithful and efficient services of the Rev. Howard T. Widdemer during the past summer, this congregation do hereby instruct the session to employ him as a supply for one year from November 1st, 1894, at the annual salary of twelve hundred dollars per annum, to be paid in regular monthly installments, together with the use of the parsonage connected with the church."

Widdemer, acting under that resolution, accepted the employment and entered into the possession of the manse; and occupied the pulpit as a supply from the first Sunday in November, 1894, to Easter Sunday in April, 1895, when he ceased to occupy the pulpit and discontinued his services as a supply or temporary pastor.

On the 2d of November immediately succeeding the congregational meeting of the 29th of October, the resolution of the congregation of October 29th was presented, read and considered by the session at a regular meeting, but no official action was taken in carrying the resolution into effect, or protest entered against it. No notice was taken by the Presbytery of this action of the congregation and the session, until the 9th of April, 1895, when the Presbytery resolved that it judged it best under existing circumstances to take the supplying of the pulpit of the defendant church into its own hands, and accordingly directed the committee

on supplies " to send a suitable person on each Sabbath after next Sabbath, until further direction from Presbytery," and they authorized the defendant Widdemer to preach in the pulpit at morning service on the 14th of April then next. After the 14th of April Widdemer ceased to preach. In the meantime, as stated by counsel and admitted at the argument, the Presbytery disciplined the members of the session for permitting Mr. Widdemer to preach in pursuance of the resolution of the congregation, and suspended all of them but one, Mr. Ford, the complainant.

On the 3d of May, 1895, the congregation had a meeting, at which they protested against the action of the Presbytery of Monmouth which had resulted in depriving them of the services of Mr. Widdemer, and then passed this resolution :

"*Resolved, also*, That inasmuch as Mr. Widdemer moved into the parsonage, November 1st, 1894, in accordance with the vote of the congregation giving it to him for one year, therefore, to keep faith with him, the trustees be requested to allow him the use of the parsonage, free of all charge, until November 1st, 1895, unless a pastor for the church shall be chosen before that date who wishes to occupy it."

And further,

" That the trustees of our church be and they are hereby instructed to fulfill the contract entered into with Rev. Mr. Widdemer on November 1st, 1894, for a salary of twelve hundred dollars for one year, and continue paying this salary until the year expires."

Such payment, however, had never been made.

In the month of April, a committee of the Presbytery served formal notice upon the secretary of the board of trustees, in which they say that they are directed to say to the trustees that "*they are directed to cause Mr. Widdemer to vacate the manse within such reasonably short time as they shall deem expedient* and to take such measures as shall preclude his intrusion into the pulpit or other church property in his ecclesiastical functions." After a consideration of the matter, a conference with Mr. Widdemer and further notices from the Presbytery, it was finally resolved, at a meeting of the board of trustees, on the 20th of June, 1895, that the board accede to the request of the congregation made in

their resolution of the 3d of May, that Mr. Widdemer be allowed the free and uninterrupted use of the parsonage until November 1st, 1895, unless a pastor of the church should be chosen before that time who wished to occupy it.

The facts are that Mr. Widdemer had moved his furniture into the parsonage, and was occupying it; that the church was the owner of no furniture, and it was not practicable for them to rent it without furniture, and they could put it to no beneficial use until they should settle a pastor.

It seems to me that the resolution of the parish meeting of October 29th, 1894, and its acceptance by Mr. Widdemer moving into the manse and the actual commencement of the performance of the duties of supplying the pulpit amounted to a contract between the parties. It is true that in order to make it binding at law upon the defendant corporation it was necessary that it should be ratified by the trustees. *Miller* v. *Baptist Church, 1 Harr. 251.* But the trustees were bound to ratify in law a contract made by their *cestuis que trustent,* and their silence and acquiescence in the taking possession by Mr. Widdemer amounted to a ratification and adoption of the action of the congregation. Hence it seems to me that it was at least doubtful whether Mr. Widdemer, if he had insisted upon the performance of the contract on his part, would not have had a strong show of a right to recover at law for his services. It is true that the contract was made without the consent of the Presbytery, but as I understand the rules of the Presbyterian church that consent was not necessary, provided the consent of the session was had. The session in this case took no action whatever. They, as well as the trustees, did not protest, but acquiesced in the action of the congregation. Hence their consent would be implied, precisely as would that of the trustees. I think the doctrine of *Miller* v. *Baptist Church* goes to that extent. It does not appear that any individual member of the congregation, being in the minority and asserting his rights as one of a minority, protested against the action of the majority of the congregation in the resolution of October 29th, 1894. The bill makes no such case. On the contrary, it appears that the action of the congregation was unanimous.

I am unable to see where the trustees were guilty of any breach of trust. They acted in strict accordance with the direction of the congregation. They were, in my judgment, not bound to pay the least attention to the mandate of the Presbytery in the matter of the parsonage or manse, for the reason that the Presbytery had no jurisdiction over the church in the matter of the use and disposition of its temporalities. I have already pointed out the difference in the character of a church edifice and a parsonage or manse. The latter is a pure temporality, and is not within the jurisdiction of the spiritual authorities and judicatories of the church.

The rule is fundamental in dealing with the judgments of all courts, and, above all, of judicatories of this nature, that the question whether or not the subject-matter be within the jurisdiction of the court is always open to question.

The doctrine of the supreme court of the United States in the case of the Walnut Street Church of Louisville, Kentucky (*Watson* v. *Jones, 13 Wall. 679*), is not in conflict with this principle. The subject-matter of that controversy was the right to control the use of a sacred church edifice, and not a manse. That right of control depended upon the question whether certain persons were or were not duly elected elders of the church, and that, again, depended upon whether or not certain proceedings of the Synod of Kentucky, under which they were elected, were or were not binding. It had been held in the case of *Watson* v. *Avery, 2 Bush 332,* that the action of the Synod in question was void because it was not in accordance with the constitution of the church. The question whether it was or was not in accordance with the constitution of the church was one wholly of procedure. It was not disputed but that the Synod might have taken the action in question if the matter had been properly brought before it. The decision of the state court was by a divided court, and the dissenting opinion, found in *2 Bush 363 et seq.*, shows, as it seems to me, that, as a matter of procedure, it was unexceptionable. When the case came before the federal court the question of jurisdiction was again raised and dealt with (*13 Wall. 732, 733*); and the fundamental prin-

ciple that jurisdiction over the subject-matter was open to inquiry was not denied, but it was held that the Synod had jurisdiction of the subject-matter, and its action was final.

I refer, on this subject, to the learned note of Judge Redfield to *Gartin* v. *Pennick, 9 Am. L. Reg. (N. S.) 220,* and to the note of the same learned judge to *Chase* v. *Cheney, 10 Am. L. Reg. 308,* and to that of Chief-Justice Fuller to the same case (at *pp. 313 et seq.)*

Now I fail to find anywhere in the constitution of the Presbyterian church, or in any decided case, any foundation for the notion that any church judicatory of that church has any control over the secular property of a society. This seems to arise from the very nature of things. Such judicatories, as we have already seen, have no control over the church edifice, in this state at least, as against the will of the society, except to declare whether or not a certain proceeding is or is not according to the tenets of the denomination. No such church judicatory can impose on even a sacred edifice within its jurisdiction any particular use of it against the will of the owners. The power of a judicatory over the sacred edifice is prohibitory only. But with regard to the profane edifice they have no jurisdiction or power whatever. The Presbytery is a voluntary association of church societies, and derives all its powers from its constituents. It serves as a bond of union between the congregations. Its object is to preserve soundness of doctrine, regularity of discipline, and to concert measures for promoting knowledge of religion, preventing irreligion, infidelity and immorality; to license candidates for the ministry, and to ordain, install, remove and judge ministers; and to appoint moderators over the sessions of vacant churches, and to furnish supplies for the vacant church. But, as we have seen, they cannot do this against the will of the congregation. The society itself, in its collective capacity, has the power to close its doors against the Presbytery, if unanimous in that regard; and if not unanimous, it has the power to refuse to pay for the supplies sent by the Presbytery. Presbyteries have power of visitation over churches, but it is wholly spiritual and advisory, and they have also the power to unite or divide con-

gregations, *at the request of the people,* and to form and receive new congregations; but they cannot divide a congregation against its will, nor unite two against their will. Their action in this regard is purely one of assistance and recognition, and is wholly spiritual.

The Presbytery in this case had the right, if the question was properly brought before it, to determine that the Rev. Mr. Widdemer was not a proper person to occupy the pulpit of that church and act as its temporary pastor; and if a majority of the congregation refused to be guided by the judgment of the Presbytery and persisted in the employment of Mr. Widdemer, then, as I have before observed, any one of the minority had a right to ask a court of equity to enjoin the majority from employing him. But the entire congregation having acquiesced in such employment, and having failed to protest or take action in the civil courts to prevent it until after the contract was not only made but partly performed, I do not see what cause of complaint there can be. The minority, if any there be, including the complainant Ford, are estopped by their silence. And, above all, I see nothing in the facts to militate against the validity of the contract. In any view it was a doubtful question, and the resolution of May 3d, directing that Mr. Widdemer might have the use of the parsonage free until it was needed for another pastor, was a fair compromise of the question, and having been, as it appears to have been, accepted by Mr. Widdemer in lieu of payment of his monthly stipend, and of all damages for the breach of contract, I can see nothing like a breach of trust in the trustees permitting the resolution of compromise to be carried out. They have no power to turn Mr. Widdemer out of the parsonage even if they were so disposed; and I know of no authority on the part of the Presbytery or any other church judicatory to command them to do so.

I have alluded to the fact that the authorities are not unanimous in upholding the right of the minority against the will of the majority in all instances. And it is impossible not to feel that in the absence of any express trust imposed by the deed of conveyance, and where, as here, the trust is implied merely from

the use of the word "Presbyterian" and the connection with a Presbytery, it is hardly in accordance with republican principles and the spirit of the age that the majority of the congregation, who actually furnish the money to pay the pastor to preach and minister to them, should not have the right to choose him. And I may venture the remark that the victory of the minority over the majority in such cases will generally prove barren in that it will tend to reduce the income of the church, and the judicatories have no power of taxation. Hence the courts should, and I think do, proceed cautiously in sustaining the minority against the majority, and interpose only in clear cases of serious diversion of property. In the present case the alleged diversion or breach is but trifling. It is apparent that the suit is prompted by the Presbytery as a matter of discipline. That consideration can have no weight with this court.

I will advise that the injunction be refused, with costs.