In 1897, what is now the Evangelical Lutheran Church of the Holy Trinity of Elizabeth, New Jersey, was organized. The trustees were duly incorporated in 1899 under the act entitled "An act to incorporate trustees of religious societies" (3 Comp.Stat. p. 4307), by filing the required certificate. The church had a modest beginning, but, apparently, grew both materially and spiritually until, in 1920, it had a membership of about four hundred. The organization had, prior to that time, erected a rather pretentious church building, which, together with the land on which it was located, had cost approximately $28,000, and against which was an indebtedness of $10,000 secured by mortgage. In that year a new pastor, the defendant Rudisill, was assigned to the church. He was young, energetic and ambitious. The church building was located in the old and less fashionable portion of the city of Elizabeth. The ambitious character of the new pastor was first evidenced by his refusal to occupy the living quarters supplied by the governing board of the church, and at his insistence a parsonage, located in the better part of the city, and one and one-half miles distant from the church, was purchased at an expense of $8,800. This money, or a portion of it, was raised by placing an additional mortgage on the church property. The pastor, after four years of work in this church, came to the conclusion that the field in the old part of the city had been worked out and that a more fertile field, at least temporarily, could be found in the section of the city where the parsonage was located. In this thought he was supported by his superiors in the synod, under whose jurisdiction the church was functioning. The abandonment of the old church and the building of the new church in the upper or more fashionable section of the city was advocated by the pastor and some members of the congregation, and at the January, 1925, congregational meeting a proposition for the sale of the church building and land was submitted and voted down. Two weeks later, at a special meeting of the members, the proposition was again submitted and again voted down. This agitation resulted, however, in the purchase of a plot of *Page 148 
land uptown, near the parsonage, and the erection thereon of a small chapel, admittedly a temporary structure, which was open for worship in March or April of 1925. New members, residents of the uptown section of the city, were admitted at the chapel and services were conducted there by the pastor every Sunday, and gradually the pastor separated himself from the old church so that he attended service there only on Sunday mornings, but he held service at the uptown chapel both Sunday morning and evening and at times during the week. Dissension arose amongst the church members, some of them, particularly the new members taken in at the chapel and including a majority of the trustees or councilmen, as they were called, and the pastor, advocating the sale of the downtown church property and the removal of the church organization bodily uptown. Financial difficulties arose, expenses increased, and at the January, 1925, congregational meeting some of the councilmen were obliged to endorse a note for $1,000 to temporarily relieve the financial stringency. The note was afterwards paid by moneys raised by the members. Additional disputes and dissensions arose between the pastor and some members of the congregation over the peremptory dismissal of a home missionary or parish worker known as "Sister Eleanor," and the church became divided into factions, one faction siding with the pastor and the other opposing his program. This was the posture of affairs as the time for the annual meeting in June, 1925, approached. It seemed to be generally understood amongst the members that something important with reference to Sister Eleanor was going to happen at the June meeting. The air was charged with mystery and the rumblings of dissatisfaction were portentous. The warring factions gathered their adherents together, so that when the annual meeting was held on June 18th, 1925, about one hundred and thirty to one hundred and fifty members of the church congregation (a large number for this church) were present. Dr. Trexler, the president of the New York and New England Synod, was also present, apparently in anticipation of trouble, and with the object of lending his support to the pastor and his followers. The meeting began at eight o'clock in the evening and lasted until near *Page 149 
midnight. It was an acrimonious affair, quite unlike what one would naturally expect from a body of men and women engaged in a work of devotion and sacrific. The meeting resulted in a vote in favor of selling the church building and the downtown property, although the meeting was not called for that purpose, and, apparently, no one of those opposed to the sale of the church had any idea that that subject was to be considered at that time until the motion to that end was made. The vote authorized the trustees to dispose of the church property, and, acting promptly, within less than a month a deposit of $500 on account of the proposed sale was accepted by them. On July 24th the offer in connection with which the deposit was made was formally accepted by the trustees, and on July 29th, 1925, a written contract was entered into between the church officials and the defendant Workingmen's Singing Society Fidel for the sale of the church property, including the organ and practically all of the furnishings except the altar and half of the pews, for $23,000. The contract was not recorded. Although some of the complainants knew of the action taken at the meeting held on June 18th, 1925, it was not definitely known until the latter part of August that such a contract had been made. On September 20th, 1925, Pastor Rudisill, at a Sunday morning service in the old church, advised the church members of the sale and announcel that after that date there would be no further services held in that church, but that services would thereafter be held in the chapel; that those desiring to do so might attend services at the chapel and those who did not desire to attend there could affiliate themselves with other churches in the neighborhood of the abandoned church if they wished to do so. Protests of members of the congregation opposed to the sale proved unavailing. When the fact of the sale first became generally known, Dr. Trexler, the president of the synod, was in Europe on a vacation, from which he returned sometime in September. A committee then waited on him at his office in New York City and appealed to him to stop the sale. He advised the committee that he would inquire into the matter and then communicate with them. After waiting sometime for some word from Dr. Trexler, and, receiving *Page 150 
none, a bill was filed in this court on September 28th, 1925, alleging that the contract of sale was unauthorized and illegal, and praying for an injunction restraining the proposed sale and further proceedings under the contract, and a decree canceling that contract. A lis pendens was duly field in the county clerk's office of Union county. An order to show cause with restraint was issued but the restraint was dissolved on its return mainly because it then appeared from the answering affidavits that authority for the sale was vested in a board of trustees or councilmen and that their act had been ratified by the members (which now appears to be untrue), and because the complainants were fully protected by the lis pendens on file. Promptly on the decision on the return of the order to show cause, and without waiting for the entry of an order dismissing the restraint, a deed for the property here involved was executed by the church officials, delivered to the defendant singing society, accepted by it and placed on record, for which acts the defendants were subsequently held in contempt by this court.
The sale of this property is attacked on two grounds — first, that it was made without authority of the members of the congregation as required by the church constitution and by-laws; and second, that the sale was made at a grossly inadequate price and was consequently a fraud on the church membership.
A second bill was later filed by the same complainants against the pastor and church council and a number of the defendant members of the church organization functioning at the chapel, praying an injunction restraining the use by the defendants of the corporate church name and interference by them with church property. These two bills were subsequently consolidated by order of this court entered by consent of counsel.
I have rather fully detailed the history of this church organization as the facts recited must be borne in mind in considering the questions presented by the consolidated suits.
The first inquiry must be directed to the legal requirements of a sale of real estate by this church organization, and the second as to whether or not these legal requirements have *Page 151 
been complied with; and then, third, assuming that the requisite legal formalities incident to a sale of this property have been observed, was the price at which the property was sold so grossly inadequate as to constitute a fraud upon the members of the congregation? A fourth question in connection with this sale has been raised by counsel for the defendant singing society with respect to the liability of that society, notwithstanding any legal defects in church procedure, it being claimed that this defendant acted innocently and should be protected in its purchase. A fifth and more important question is brought in issue by the second bill, and that is whether or not the defendant Rudisill and his followers should be restrained in the use of the corporate name of the Evangelical Lutheran Church of the Holy Trinity and from interference with the church property.
I will consider these questions in the order mentioned.
 1.
This question involves a consideration of the statutory law of this state relating to religious societies.
Evangelical Lutheran churches are governed by the same statutes as the Reformed (formerly the Dutch Reformed) and German Reformed churches (3 Comp. Stat. p. 4318 § 26), except as provided inP.L. 1884 p. 263. 3 Comp. Stat. p. 4352. Section 8 of the general act concerning religious societies (3 Comp. Stat. p.4309), and sections 13 to 25 of the Revision of 1877 (3 Comp.Stat. p. 4315), apply to Reformed churches, and, hence, to the Evangelical Lutheran churches.
Section 8 of the general act provides that acts of the corporation shall be by a majority only.
Section 15 of the act applying to Reformed churches is practically a counter-part of section 3 of the general act (3Comp. Stat. p. 4308), and provides that the trustees shall have power to purchase and sell real property, but that no deed of conveyance shall be valid unless signed by a majority of the members of the corporation. (As it is the trustees who *Page 152 
are incorporated under the act this apparently refers to a majority of the trustees and not a majority of the members of the congregation.) Section 23 of the act, applying to Reformed churches, is practically a re-enactment of section 8 of the general act.
In 1886 (P.L. 1886 p. 178) a general act was passed by the legislature, applying to all religious societies and requiring that a sale of real estate must be authorized at a meeting by two-thirds vote of the majority of the society "present at said meeting." This act, as amended (P.L. 1889 p. 37), appears as section 151, 3 Comp. Stat. p. 4359.
In 1890 (P.L. 1890 p. 156) another general act was passed authorizing the trustees of a church or religious society to sell and convey real estate upon being duly authorized to do so at a meeting of the members, without specifying the required vote. This act now appears as section 154, 3 Comp. Stat. p. 4359.
In 1895 (P.L. 1895 p. 707) a further act, now appearing as section 156, 3 Comp. Stat. p. 4360, was passed by the legislature, specifically applying to Methodist Episcopal churches, and, also, it would seem, to "other churches or religious societies," and requiring a majority vote of the members of the congregation at a meeting called on ten days' notice of the time, place and object to legally authorize a sale of real estate of such religious society.
In 1900 an act now appearing as section 24b of the compilation (3 Comp. Stat. p. 4318) was passed confirming the rights of the Reformed churches (and, consequently, the Evangelical Lutheran Church) to sell and convey real property by a majority vote of the consistory (trustees), notwithstanding acts requiring a vote of the congregation. This act was apparently passed by the legislature in an attempt to clear up, at least so far as the Reformed church was concerned, what would appear to be an almost hopeless confusion of legislation respecting conveyances by religious societies. I have referred to these various statutes to indicate this confusion, and also because their enactment marks, in part, the development of the law applicable to the issue here involved. If, therefore, this question were controlled by *Page 153 
statute exclusively, it would appear to me that the trustees of the Evangelical Lutheran Church of the Holy Trinity had authority by a majority vote to sell and convey real property without consulting the members of that church. However, while corporations or religious societies may not dispense with statutory or constitutional requirements respecting the sale and conveyance of real property, they may, in their charter, constitution or by-laws, provide safeguards, restrictions and limitations on such sales or conveyances, in addition to those provided by the constitution or statute unless therein or thereby restrained from so doing. And when such additional restrictions or requirements respecting corporate conveyances are imposed by charter, constitution or by-laws, those restrictions become a part of the contract entered into by the stockholders or members among themselves and equally as binding inter sese as the laws of this state. Kean v. Johnson, 9 N.J. Eq. 401; Loewenthal v.Rubber Reclaiming Co., 52 N.J. Eq. 440; Einstein v. RaritanWoolen Mills, 74 N.J. Eq. 624; Costello v. Thomas Cusack Co.,96 N.J. Eq. 86; Colgate v. United States Leather Co., 73 N.J. Eq. 72; In re Newark Library Association, 64 N.J. Law 265;Zabriskie v. Hackensack and New York Railroad Co., 18 N.J. Eq. 178; Brown, Receiver, v. Morton, 71 N.J. Law 26.
Some provisions of the constitution and by-laws of the Evangelical Lutheran Church of the Holy Trinity are therefore pertinent for consideration here.
Article 3, section 1 of the constitution as amended in 1903 provides that all members "of the congregation above twenty-one years of age who regularly contribute as God has prospered him to the support of the church," are entitled to vote at all congregational meetings. (As interpreted and acted upon by this church organization, the conscience of the member respecting his qualifications is the only guide.)
Section 3 of this article provides that business of the society should be conducted as ordered in the constitution and by-laws. Thus, it will be seen that the by-laws, in effect, and to the extent indicated, are for all practical purposes a part of its constitution.
Article 4, section 1 of the by-laws provides that the board *Page 154 
of trustees shall not have the power to dispose of real estate "except with the consent of three-fourths of the qualified electors present at the election held for that purpose." The provisions of this section of article 4 are further emphasized in section 5 of article 7 of the by-laws.
From the foregoing it will be seen that this church organization had no authority to dispose of its real property except upon a "three-fourths vote of the qualified electors present at the election [meeting] held for that purpose," and, indeed, that was the apparent understanding of the pastor and members as evidenced by the voluminous testimony in this cause. This conclusion seems also to be warranted by our decisions.
In Van Houten v. Reformed Dutch Church (1864), 17 N.J. Eq. 126,
it was held that the trustees held the title to the real property for the church members, the cestuis que trustent, but not subject to their control. There section 13 of the act concerning religious associations (Nix. Dig. (1861) 723) was under consideration, but in Morgan v. Rose (1871),22 N.J. Eq. 583, the court of errors and appeals held that the trustees under that act had a bare trust in real estate and were obliged to hold and dispose of the property of the society as directed by the members. The decision in Van Houten v.Reformed Dutch Church, supra, was there explained to be due to the express provision of the church constitution which controlled. Section 13 above referred to is now section 15 of the Revision of 1877. 3 Comp. Stat. p. 4315. In the Morgan v.Rose Case, section 3 of the general act was under consideration (Nix. Dig. (1861) 722), and this is now section 3 of the latest Revision. 3 Comp. Stat. p. 4308. The provisions of sections 3 and 13 are, however, practically identical, except for the provision respecting the execution of deeds, and the decision of the court of errors and appeals in the Morgan Case is applicable to both. See, also, Everett v. First PresbyterianChurch, 53 N.J. Eq. 500. Statutes prescribing a majority, three-fourths or two-thirds vote of the members of religious societies to authorize the sale of property, are, apparently, the outgrowth of these and other decisions interpreting this act, and show the development of the law relating *Page 155 
to such associations. The purpose of the provisions for the incorporation of trustees of religious societies as contained in the original act was not to deprive the congregation of the right to control of church property, but to transmit it in perpetual succession. It will be seen therefore that the statutes, and the charter, constitution and by-laws of the religious society involved in a given controversy are to be read together for the purpose of determining the legal requirements for the disposition of its property.
But it is argued here that the constitution or by-laws of this society cannot override the Statute law, but the answer to that argument is that the provision of the by-laws of this church requiring a three-fourths vote was adopted as a part of the organization of the society, and thereby became an incident of the contract among the members and not subject to impairment by subsequent legislation. Loewenthal v. Rubber Reclaiming Co.,supra. To concede that argument would be to permit a sale to be authorized, not by a majority where two-thirds are required, as was said by Vice-Chancellor Griffin in Costello v. Cusack Co.,supra, but by no vote at all of the members where three-fourths are required.
 2.
The next question is whether or not this requirement of the constitution and by-laws of the church organization for a three-fourths vote of its members was complied with.
Various estimates of the number of members present at the congregational meeting of this church on June 18th, 1925, are given by witnesses for both complainants and defendants. These estimates range from one hundred and thirty to one hundred and fifty. It is probable that no one knows definitely how many members were actually present, but I think it is safe to assume that there were at least one hundred and forty members present. The secretary submitted a list of such members made up from memory several months or a year after the meeting and he fixes the number at one hundred and thirty-two, of which he says thirteen were minors; but he *Page 156 
admits that his list is only approximately correct, and as he is on the side of the defendants it is safe to assume that his estimate is no exaggeration.
The testimony in this cause was voluminous and on many points quite contradictory; but the great weight of the testimony and evidence supports the contentions of the complainants. Except where I have otherwise indicated herein, my recitals of the facts are as I believe them to be shown by the clear preponderance of the evidence. Thirteen witnesses actually testified for complainants as to what occurred at the meeting of June 18th, 1925. Ten witnesses testified on behalf of the defendants with respect to these matters. It was conceded and stipulated by counsel for defendants that forty-eight additional witnesses subpoenaed by complainants and present at the hearings would, if called, testify to substantially the same facts as were testified to by these thirteen, and that their testimony should be considered by the court as though it had been taken without putting the complainants to the necessity of actually calling and swearing those witnesses. Defendants' counsel offered a list of seventy additional witnesses who, he suggested, would testify along the same lines and to substantially the same facts as the ten who had actually testified, but after inspecting the list, complainants' counsel refused to enter into a stipulation with respect to what they might testify to. Aside from this, however, the weight of the evidence is with the complainants.
The first matter considered at the meeting of June 18th was the dismissal of Sister Eleanor, and the debate on this subject was a spirited and heated one, during the course of which someone suggested that the pastor should resign. Then the question of finances was brought up. Interest on the mortgage and an installment of principal would fall due in the following month and the treasury was about $800 short of the required amount to meet these payments. Subscriptions were called for, and while they were being received, a Mrs. Moyle, a member of the church, arose and said there was a rumor that the pastor was still trying to sell the church and that with the uncertainty respecting that matter existing, members were reluctant in making pledges, *Page 157 
and asked the pastor if this rumor were correct. He replied that it was not; that the matter of the sale of the church had been definitely disposed of at the January meeting and that he could not sell the church and told her that if she would listen less "to the wagging of tongues" there would be less trouble in the church, or words to that effect. The complainants claim that after this remark a large number of the members, resting on this assurance of the pastor that the church was not to be sold that night, left the meeting, and that thereafter, while the discussion respecting the raising of funds was going on, members continued to leave from time to time, until there was not more than half of the original number present, when a motion to adjourn was made and seconded. The pastor refused to put the motion, declaring it out of order, and then someone made a motion to sell the church. This was seconded and a vote by ballot taken, during the course of which several more members left the meeting. The tellers appointed to receive the ballots reported sixty-five votes cast — fifty-eight for the sale, five opposed and two blank. The meeting thereafter broke up in some disorder. It is around this episode that the whole controversy has arisen. While the testimony with respect to what occurred at that meeting is very much at variance, different witnesses testifying as to different numbers of persons who left the meeting and the times of their leaving, and the number remaining until the meeting closed, I am convinced that after the remark about the sale of the church attributed to the pastor, a considerable number of persons left the meeting because they were lulled into a sense of security by the pastor's statement; and later, when the motion to sell was made, others, realizing that many of those who were opposed to the sale had left and that those supporting the pastor were in the majority, left because they did not want to participate in any proceeding which would, as then appeared, result in a sale of the church property. While I know that our decisions are to the effect that one who is present at a corporate meeting and withdraws therefrom cannot complain, ordinarily, as to what took place after his departure, that is not a rule of universal application. *Page 158 
Each case must necessarily be governed by its own peculiar circumstances. There is no doubt in my mind but that a majority of those members who left the meeting after the pastor's remark were lulled into a sense of security respecting the sale of the church and that the consideration of that question at that meeting, at least after the departure of any considerable number of members, was highly improper and smacks of fraud as to them. Indeed, this situation was appreciated by the pastor himself as shown by his admitted hesitancy in putting the motion and his inquiry of Dr. Trexler whether or not under the circumstances it ought to be put in fairness to those who had left. True, the pastor, Dr. Trexler, and some others testified that at the time Mrs. Moyle asked the question concerning the sale of the church, and the pastor's statement that "that matter had been settled at the January meeting," he also added that if anyone made such a motion to sell at that meeting he would have to consider it. If he did make such a statement, and the weight of the evidence is to the contrary, its force was entirely lost by reason of what he had previously said. There is no doubt in my mind but that seeing the difficulty which was being experienced in raising funds at this meeting, the pastor, in effect, by his attitude and remarks, invited the motion to sell, and this after a motion to adjourn was made and seconded but not put to a vote, and I consider this procedure to have been highly improper.
As to the number of members present at the meeting, the number who left and the number who remained: The strongest and most favorable testimony for defendants with respect to this question is that of the secretary, who made up the list months afterward. He says there were one hundred and thirty-two members present in the early part of the meeting and that not over thirty left before the vote was taken. Assuming this to be correct, there were at least one hundred and two members present when the vote was taken, and of these thirteen were minors. This would leave eighty-nine members qualified to vote, of which three-fourths would be sixty-six. The constitution requires a three-fourths vote of "members present," not "members present and voting," *Page 159 
so that sixty-six votes were necessary to authorize a sale. But if we accept any of his testimony, we are also justified in accepting the statement that the twenty-five members who withdrew during the taking of the vote did not actually leave, but remained at the open doors and windows to see what was happening and that they were actually present, although perhaps theoretically absent. If this be so then we must consider that one hundred and twenty-seven were present, and after deducting the thirteen minors there would remain one hundred and fourteen voting members, and it would require three-fourths of that number, or eighty-five, to authorize the sale; so that from whatever standpoint we look at it, the required three-fourths vote was not obtained. Complainants claim there were only between sixty and seventy present, and if this is so a three-fourths vote was obtained, but in view of what has been said respecting the pastor's remarks, inducing many members to leave, the vote was of no effect. The three-fourths vote should be based upon the number originally present.
But the constitution requires notice of a meeting at which a proposition to sell real estate is to be considered and all are agreed that no such notice was given. The fact that this was a regular annual meeting would not justify the consideration of a proposition for the sale of real estate without notice that such a proposition was to be submitted. The provisions of the constitution and by-laws were wise precautions taken by the original organizers of this church against the very thing which was being here attempted, namely, the selling out of the majority by the minority. Can it be doubted that if the members had been apprised of the intention of the pastor and his followers to consider the sale of the church at this meeting a larger attendance would have been had? The fact that there was not a larger attendance at the January meeting is not conclusive because it does not appear that any notice of the proposed sale or its consideration was given for that meeting either. The wisdom of the founders of this church organization in providing this salutary safeguard of property rights and the absurdity of the contention of the defendants is plainly indicated *Page 160 
by the colloquy which took place between the pastor and Dr. Trexler at the meeting of June 18th, when the pastor hesitated about putting the motion to sell, and Dr. Trexler said, "How many members constitute a quorum?" to which the pastor replied, "Ten." Can it be imagined for a moment that any court would sustain a sale of church property on a three-fourths vote of ten members out of a membership of over four hundred at a meeting which had not been called for the purpose of considering such sale and of which no notice had been given? The very question indicates its only possible answer. True, the constitution or by-laws provide for a quorum of ten members, but that same document provides for a three-fourths vote of members present at a meeting called for the particular purpose after due notice, which notice, it will be observed, was of a different character from the notice required for usual and less important meetings.
It is a significant fact, testified to by the secretary, that none of the uptown or chapel members left the meeting of June 18th until its close and that they were all there. It is also significant that prior to this meeting the pastor and one or two of his members had carefully checked up the membership list to determine who had and who had not paid up their usual contributions and which of the members they might prevent from exercising their right to vote. I am convinced that the pastor and his adherents, prior to this meeting, had definitely decided to sell the downtown property and move the church organization bodily uptown, at all costs.
Some idea of the motives actuating the pastor and his followers, and explaining the attitude of Dr. Trexler toward those who wished to retain their place of worship downtown, which they had grown to love and cherish, as indicated by a circumstance which was brought to light during the course of one of the hearings, and while Dr. Trexler was on the witness-stand. After the pastor had abandoned the church downtown and that portion of his flock which desired to worship there, they arranged with a Lutheran minister from another parish to preach to them and conduct their services for them. On complaint of Pastor Rudisill to Dr. Trexler *Page 161 
this accommodating minister was obliged to cease his ministrations and the organization was therefore left like a flock without a shepherd. A committee of the members then waited on Dr. Trexler in his sanctum in New York, and after being kept waiting in an outer room for four hours, were dismissed by him in about as many seconds. They requested him to supply them with a pastor, which he refused to do. When this was brought out in the testimony, the court asked Dr. Trexler, "Why, when you knew this organization was without a pastor, and when a request was made to you for one, did you not supply its wants?" His reply was, "I did not consider it ethical." How long "the ethics of the profession," as I suppose that is what he referred to, has been applied to the saving of souls or upon what authority, he did not advise the court. But it is contended that the action of the trustees in entering into a contract for the sale of the church property was subsequently ratified. The so-called ratification, however, consists of a written approval of this action signed some weeks after the sale and after the first bill was filed. About one hundred and fifty persons signed this paper, many of them minors, non-members and persons admittedly not entitled to vote. This is obviously an attempt to lend legal color to the previous proceedings and at the same time make evidence in this cause. It does not amount to ratification in any sense of the word. It represents the individual action of a number of members of that faction of the church organization supporting the pastor. But the by-laws require action, "at a meeting called for that purpose," and individual action by any number of members cannot be substituted for this requirement.
In view of these facts as I find them there is no doubt in my mind but that the action of the church council in entering into this contract of sale and the subsequent conveyance were unauthorized acts and not binding on this church organization, and that I would be remiss in my duty if if did not set the whole transaction aside and declare the proceedings null and void. That in such circumstances the complainants are entitled to relief cannot be doubted. *Page 162 Holmes v. Trustees, c., 58 N.J. Eq. 327; Van Houten v.Reformed Dutch Church, supra.
 3.
In view of my conclusion as to the legality of the proceedings authorizing the sale, it is perhaps not necessary to go into the question of inadequacy of price; but the testimony respecting this point was so short and so plainly indicative of the character of this transaction that I feel I ought briefly to refer to it.
Two expert real estate men were called and examined on this point — one for the complainants and one for the defendants. Their qualifications were admitted and apparent. Boyle, the complainants' expert, placed the value of the land at $7,500, and the buildings, less depreciation, as of September 1st, 1925, at $52,741.30, or a total of $60,241.39. This he considered the fair market value of the property for church purposes. For other than church purposes he fixed a value of $35,000. Miller, the defendants' expert, fixed a value of from $7,000 to $7,500 on the land. He said that his valuation of the church building would be "the wildest kind of a guess," but that he would guess $28,000, which, added to the value of the land, would be $35,000. He also said, however, that a valuation of $50,000 for church purposes was not out of the way.
The complainants also called a building expert, who testified that the replacement value of the church building was $54,200. He did not, of course, place any value on the land.
It will be noted that in these estimates no consideration is given to furnishings.
It cannot be denied, therefore, that property which has a value of from $35,000 to $50,000, depending upon the purpose for which used, was sold for $23,000, one-third or one-half less than it is worth, with the organ and furnishings thrown in. The testimony discloses that three offers were received by the trustees of this church for the property; one of $22,000, by the defendant singing society, afterwards *Page 163 
raised to $23,000 on account of the church furnishings being included in the sale; an offer of $25,000 from a colored church organization, and an offer of $27,000 from the city of Elizabeth. The explanation of the refusal to consider the two higher offers was that with respect to the colored church organization there was no apparent financial responsibility; and with respect to the city, no appropriation of funds had been made; that the offer was only testative because the officers submitting it were without authority. These officers, however, were those who were charged with the duty of putting the legal machinery of the municipality in operation to accomplish such a purchase, after it had been decided upon. It cannot be assumed that theirs was a meaningless gesture. There was no reason for any undue haste in connection with this sale. The mortgage was neither due nor in default nor had it been called, nor had any proceedings in foreclosure, so far as is disclosed by the evidence, been threatened. Even if they had been, a sale of the church property could not have been had under two or three months, which would have afforded ample time, perhaps, to have raised the necessary funds to pay off the mortgage or to have made other financial arrangements which would have permitted the church organization to still retain its property. The unseemly haste with which this sale was consummated, however, without any attempt to make a market for the property, coupled with the admitted intrinsic value and the probable market value, if a market had been developed, bearing in mind also the acceptance of the lowest offer received, all suggest a desire and intention on the part of those active in making a sale to sell at any price and with a reckless disregard of the rights of others.
 4.
As to the contention that the Workingmen's Singing Society Fidel should be protected in its purchase, notwithstanding any legal defects in procedure because it was innocent of the true facts and did not participate knowingly in a fraudulent transaction, it is enough to say that before the *Page 164 
contract of sale was executed this defendant had full notice of the complainants' claims and before a conveyance was accepted alis pendens had been filed. Consequently, upon the acceptance of a conveyance it was taken subject to all the rights of the complainants. The defendant was of course entitled to be protected from loss, but at that time it had only $500 at stake and could easily have retreated and recovered its deposit, but it chose to go on, and in doing so accepted the risk of having the sale and conveyance set aside. This defendant should, however, be reimbursed for any expenditures prior to the filing of the lispendens.
 5.
Now, as to the right to the use of the corporate name and franchise and the control of the property of this church organization.
There is undoubtedly a schism here, and, in my judgment, while the pastor and the majority of the trustees have migrated uptown and are, with the sanction of the synod, using the corporate name and have control of that portion of the church property which they did not attempt to dispose of, this is in violation of the rights of what may be termed the downtown members, who are apparently in the majority and who collectively are functioning as a church organization downtown, and would be, but for the pastor and his adherents, still worshipping in the old church. But a portion of a religious society cannot disfranchise the rest, nor can even a majority, arbitrarily withdraw from the minority and appropriate to themselves the corporate name and property of the organization. Hendrickson v. Decow, 1 N.J. Eq. 577
(at p. 644); Altman v. Benz, 27 N.J. Eq. 331.
Of course, a majority, acting legally, may regulate the temporal affairs of a religious society. Miller v. English,21 N.J. Law 317. But if the separation of a majority from the minority is not accomplished in a legal manner, the remains of the "ancient society" constitute the corporation *Page 165 
entitled to the use of the name and property. And in no case may a faction, however large, secede and take with it the church property where there remains a body which is loyal to the former affiliation. Schlistra v. Van Den Heuvel, 82 N.J. Eq. 155.
And, as between two opposing factions of a religious association, land acquired by the association before any schism arose will remain the property of that faction which abides by the doctrines, principles and rules of the church government which the united body professed when the land was acquired. The TrueReformed Dutch Church of Paramus v. Harvey Iserman et al.,64 N.J. Law 506.
The defendants claim here, of course, that the pastor, the trustees and their adherents who moved uptown, constitute the faction abiding "by the doctrines, principles and rules of the church government," c., and that the complainants are the separatists and that they are not now worshipping at "Lutherans." But I cannot agree with this contention. True, they do not now have a pastor from the New York and New England synod, but that is not because they do not want one. After the division they were ministered to by a pastor from this synod until he was peremptorily directed by the president to quit, and a supply from this synod was refused. These members have not left the church; it is Dr. Trexler who has thrown them into "outer darkness." That the New York and New England synod recognized Pastor Rudisill and his followers as the real church organization at the convention referred to in the testimony is not at all binding on this court. The decision of that body was controlled and directed by its president and can be considered in no other light than as an attempt to make evidence in support of the defendants in this suit. The decision was had during the pendency of these proceedings and after the hearings had begun.
But, notwithstanding my opinion that the uptown members have illegally withdrawn, they still have rights which this court should protect and the complainants, seeking equity, must be ready and willing to do equity. My conclusion *Page 166 
is that uptown members constitute the separating or seceding faction, but this court will hold the doors open and permit them to return if they desire to do so. The two factions will be considered as one organization, but the officials and trustees of neither faction will be recognized by this court. When the officers and trustees chosen by the downtown members withdrew, their offices became vacant, and the officers and trustees chosen by the downtown members were chosen at a meeting of which the uptown members had no notice. For the purpose of effecting a consolidation of these two factions in the former fold, I will appoint a master of this court to conduct an election of trustees by the members, and after a reorganization of the church body has been effected, such disposition of the property may be made as the members legally decide. Other equities may be determined upon the fixing of the terms of the decree.
It is objected that the complainants are barred from any relief in this court because of laches in taking no action to prevent this sale between June 18th, 1925, and September 28th, 1925. It is not necessary to deal with this question minutely; suffice it to say that it was not definitely known that a contract of sale had been entered into until sometime in August and between that date and the date of the filing of the bill the complainants, as properly befitted members of an organization of this kind, were endeavoring to obtain relief out of court and applied to this tribunal only as a last resort. Under the circumstances I think there was no unreasonable delay.
 I will advise a decree in accordance with these conclusions. *Page 167