NEMETH KAROLY et al.

*v.*

HUNGARIAN REFORMED CHURCH OF NEW BRUNSWICK, NEW JERSEY, et al.

[Submitted June 22d, 1914. Decided July 24th, 1914.]

1. In a suit to set aside a conveyance of church property, evidence *held* to require a finding that the grantor corporation and its adherents were affiliated with the Presbyterian Church of North America, and was not an independent body without ecclesiastical affiliation.

2. Though one or any number of members of a church organization may secede at will, no number, however great the majority, may secede and take with them the church property to a new affiliation, so long as there remains a faction which abides by the doctrines and rules of the church government which the united body professed when the property was acquired, in which case the property can be disposed of only in accordance with the method prescribed by the judicatory of the original body.

On final hearing on bill, answer, replication and proofs.

This is a controversy between two ecclesiastical bodies and their adherents over the ownership and possession of a church edifice and lands situated in New Brunswick. The claim on

the part of the complainants is that the property in suit belongs to a corporation which is affiliated with the Presbyterian denomination.

The defendants, on the contrary, claim that it now belongs to a corporation which is affiliated with an ecclesiastical body known as the Reformed Church of Hungary, having its *situs* and headquarters in the Empire of Austria.

Prior to 1904 there were many of Hungarian birth and speech in New Brunswick who had formed a voluntary association for the purpose of having divine service held in their native language. Dr. Knox, then and now the pastor of the First Presbyterian Church of New Brunswick, took an oversight of these people, performed their marriages, attended at their funerals and administered such spiritual comfort as he was able to, and it gradually came to be looked upon as a sort of Hungarian annex to the First Presbyterian Church. As early as the spring of 1903 the standing committee on Synodical Home Missions of the Presbytery of New Brunswick made a report to the Presbytery concerning this voluntary association, and introduced to it Mr. Paul F. B. Hamborszky, then a student in the Princeton Theological Seminary, who had been devoting his time and attention to this Hungarian body; and thereupon, in April of 1903, Mr. Hamborszky presented a request from one hundred and sixty Hungarians belonging to that body asking to be taken under the care of the Presbytery. Such proceedings were had in the Session of the First Presbyterian Church and in the Presbytery of New Brunswick, that shortly thereafter one hundred and seventy-one persons were admitted to membership in that church from the Hungarian voluntary association above mentioned.

In the early part of 1904, the committee on Synodical Home Missions, to whose care the Hungarian body had been committed, recommended that they should be dismissed from the First Church of New Brunswick and should constitute a separate mission congregation, in pursuance of which recommendation there was organized, on August 5th, 1904, under the laws relating to religious societies, a corporation having the name

the "Hungarian Presbyterian Church Evangelic Reformated Church." Of this corporation the one hundred and seventy odd Hungarians who had joined the First Presbyterian Church became members. For reasons, which do not appear plainly, the name of this corporation was changed, on October 24th, 1905, to "Magyar Evangelically Reformed Presbyterian Church of Brunswick, New Jersey;" and later on, on December 9th, 1909, its name was again changed to "Magyar Evangelical Reformed Church of New Brunswick, New Jersey," by which name it claims the title to and ownership of the church property in question.

The contesting claimant is a corporation likewise formed under the general laws of this state concerning the incorporation of religious societies, on July 12th, 1912, by the name of the "Hungarian Reformed Church of New Brunswick, New Jersey." Three days later, and on July 15th, 1912, the officers of the old corporation conveyed, or attempted to convey, the premises in question to the new corporation in consideration of "one dollar and other valuable considerations." This was done by two deeds which the complainants pray may be declared to be null and void. The certificate of incorporation of the new corporation (the Hungarian Reformed Church of New Brunswick, New Jersey) provides that it

"shall be and remain in inseparable connection with and under the ecclesiastical jurisdiction of the Hungarian Reformed Church in America and the Reformed Church of Hungary,"

and that it

"shall have power from time to time to adopt, alter and amend such by-laws as shall be expressly approved in writing by the Hungarian Reformed Church in America and the Reformed Church of Hungary,"

and that

"no transfer, sale, conveyance, alienation, disposition, lease, encumbrance or mortgage of any of the property of said church or congregation shall be binding or valid for any purpose whatsoever, unless it be made by and with the express consent in writing of the Hungarian Reformed Church in America and the Reformed Church of Hungary."

The Hungarian Reformed Church in America therein referred to is the highest American judicatory of the Reformed Church of Hungary.

It will thus be seen that if the conveyances in question shall stand, the property in suit is irrevocably taken from the Presbyterian connection and is irrevocably transferred to a connection with a foreign ecclesiastical dominion.

*Messrs. Hutchinson & Hutchinson* (*Mr. Conover English* on the brief), for the complainants.

*Mr. Alfred F. Skinner* and *Mr. Morris Cukor* (of the New York bar), for the defendant.

*Mr. Walter C. Sedam* (of the New York bar), for Rev. Paul F. B. Hamborszky.

HOWELL, V. C.

The principal question of fact is whether the old corporation and its adherents were affiliated with the Presbyterian denomination, or whether they were an independent body without ecclesiastical affiliation with any other body of Christians. If they were so affiliated with and had so become a part of the Presbyterian denomination, then their secular affairs are governed by plain rules of law relating to the ownership of ecclesiastical property, and if they shall be found to be an independent body, they are then governed by other rules which are quite as plain. I have no doubt but that the old corporation and its adherents were Presbyterians and were affiliated with the Presbyterian denomination in every sense of the word, and that they broke the tie of brotherhood in an irregular and disorderly manner. Nor do I think it can be said that any fraud or imposition was practiced upon these non-English speaking people, as has been suggested, because the things that they did and saw and took part in could not fail to impress the most ignorant and careless persons that they were connecting themselves with and were a part of the old corporation with all its Presbyterial formalities. I may pause at this point for a moment to explain

the government of the Presbyterian Church. There is first the congregation or worshiping unit, consisting of individual members in every walk of life, who stand on an equality with each other so far as their ecclesiastical relations are concerned. These are governed spiritually by a body called the Session, chosen from their own number. The Session is governed by the Presbytery, a body consisting of delegates elected from each individual church within a certain prescribed geographical area. The Presbyteries, in turn, are spiritually controlled by the Synod, a representative body, meeting for each state, and the Synod by the General Assembly of the Presbyterian Church. Thus is formed a compact and strongly-knit ecclesiastical body having a common purpose, with common objects, and bound together by valid promises and agreements, which promises and agreements may not be lightly broken, but, so far as property rights are concerned, are as binding and cogent as are agreements made concerning other rights of property.

We have seen what interest the Presbyterians of New Brunswick took in this struggling association prior to its organization into a corporation. We have seen that this corporation carried as part of its name the word "Presbyterian," and that when its name was changed in the following year the word "Presbyterian" was retained. After its incorporation and its segregation from the First Presbyterian Church of New Brunswick, other things were done which still more strongly indicate to my mind the intention of these people to form and retain the Presbyterian connection. The one hundred and seventy odd Hungarians who became members of the First church were dismissed to the new congregation after its formation, and until the final attempt at separation in 1912 the Presbyterian Church by its Presbytery, its synodical committee and its Session of the First church, exercised a fostering care over the spiritual welfare of this body of Hungarians, and gave them material aid in maintaining their organization. During the whole period of its existence they furnished money for its support, and in every way possible encouraged them by contributions and by advice to continue in their work. On April 9th, 1907, the Rev. Mr. Hamborszky was installed as pastor of the church; he was a

Presbyterian in fact and in name; he was a graduate of a Presbyterian theological seminary; he had been a member of Presbytery of Lackawanna, and later became a member of the Presbytery of New Brunswick. His call from the congregation was presented to the Presbytery in full Session in his presence, and then and there acted upon by the Presbytery, and accepted by him. The installation ceremony took place in their own church building. It was widely advertised and took place in open meeting; a large crowd was in attendance, the church being full. There was a sermon in the Hungarian language, containing a charge to the pastor, and likewise a charge to the people in the same language by one of the clergymen present, and the assent of the whole congregation to the whole proceeding was manifested by a vote of approval, in which there were no negatives. On one occasion the Presbytery met in the church building of the Magyar church on Hale street, and the women of the congregation furnished a noon-day meal to its members. They made a mortgage in 1905 on the Hale street property to the board of church erection fund of the Presbyterian Church, which, by the terms of the mortgage, ran without interest so long as the property remained in the Presbyterian connection. They contributed to the funds of the Presbytery; they sent delegates to its regular meetings, made to it reports of their progress, and submitted the minutes of the meetings of the Session of the church to it for examination and approval.

All these proceedings point in but one direction. They indicate beyond question that the Hungarians who belonged to the old corporation fully understood that they were Presbyterians and were bound by their Presbyterian connection. Least of all, can the Rev. Mr. Hamborszky find any excuse whatever for his unseemly and disorderly conduct in his endeavor to release himself from the Presbyterian control. It cannot be said that he did not understand what he was doing; he is an educated man, perfectly familiar with the English language, and he fully understood every step which he was taking and which he was advising his congregation to take.

There is no doubt about the right of individual members of a church organization to secede therefrom at will. The same is

true of any number of members of such organizations; but no number, however great the majority may be, has the right to secede and take the church property with it to the new affiliation, so long as there remains a faction which abides by the doctrines, principles and rules of the church government which the united body professed when the land was acquired. *True Reformed Dutch Church of Paramus* v. *Iserman, 64 N. J. Law 506.* The question of law on this point was decided in the case of *Schilstra* v. *Van Den Heuvel, 82 N. J. Eq. 155,* affirmed March term, 1914, in the court of errors and appeals on this point. It was there said: "The rules of law relating to freedom of action by independent churches and congregations are different from those rules which apply to congregations which are affiliated with and are subordinate to higher judicatories. Independent churches may do what they please with their property, provided legal action is taken to that end, but when a religious society becomes affiliated with other religious societies and they unite to construct and maintain for their mutual advantage higher judicatories to which they subject themselves, then the individual society or worshiping unit holds its property and temporalities under an obligation to continue the affiliation until it can be broken by mutual consent, and if secession is attempted by a faction, however large or however small, such faction will not be allowed to carry the church property with it, certainly not so long as there is a loyal body which is recognized by the superior judicatory." Citing *American Primitive Society* v. *Pilling, 4 Zab. 653; True Reformed Church* v. *Iserman, 64 N. J. Law 506; Pullis* v. *Iserman, 71 N. J. Law 408; 24 Am. & Eng. Encycl. L. 354.*

I have, therefore, arrived at the conclusion that the original corporation was allied and affiliated with the Presbyterian denomination, as a matter of fact, and that the members understood and believed that they were so connected, and that, as a matter of law, it was not competent for the seceding members of the congregation to appropriate to themselves the church property described in the two deeds hereinabove mentioned, and that the deeds should be declared to be null and void and the

property restored to its former owner, the Magyar Evangelical Reformed Church of New Brunswick, New Jersey.

I will advise a decree in accordance with these views.