It is indeed lamentable when those united in their devotion to God, discordantly attempt to sever their accustomed unity in the pursuit of religious worship.
A preliminary phase of the controversy which occasions this litigation came to my attention at the suit of the pastor.Skinner v. Holmes, 133 N.J. Eq. 593; 33 Atl. Rep. 2d819. Upon the dissolution of the preliminary restraint in that cause, these defendants promptly locked the entrances to the church edifice. The present cause is being prosecuted by certain members of the local society. Counsel were induced to abandon the argument of matters of a preliminary character and present the evidence in order that I might promptly approach the more agreeable duty of deciding the cause upon its substantial merits.
It should be at once comprehended that this court in such conflicts participates only in the protection and enforcement of property rights or in the supervision of a trust, taking notice of ecclesiastical doctrines, organization or discipline only as they affect those rights. Frankly, it is not the province of this court to modify or change the tenets and discipline of this or any other denomination or religious order. *Page 188 
Almost a century ago (May, 1844) certain individuals united in forming a church at Trenton which they denominated "The African Wesleyan Methodist Episcopal Church of the City of Trenton." On May 10th, 1872, a more copious certificate of incorporation was recorded which declared that the church should thereafter be distinguished by the name "The African Methodist Episcopal Wesleyan St. Paul's Chapel" and "shall be governed and regulated in all its concerns by and in conformity to the book entitled `The Doctrines of the Bible and Discipline of the Methodist Episcopal Church.'" The New Jersey Conference of the African Methodist Episcopal Zion Church was formed in 1874. The records reveal that on May 11th, 1875, a certificate was registered by the society changing the corporate name to "Saint Paul's African Methodist Episcopal Zion Church of the City of Trenton and State of New Jersey." The affiliation of the Trenton congregation with the New Jersey Annual Conference is first mentioned in the minutes of 1877. Again on November 19th, 1878, the corporate title was converted into "African Methodist St. Paul Zion Church." There has not been for many years an African Wesleyan organization in America, although such may be found in England and in some of the British possessions. The parcel of real estate upon which the meeting house is situate was conveyed by one George Hoffman to "The African Methodist Episcopal Wesleyan St. Paul's Chapel" by deed dated September 10th, 1880. Notwithstanding the mutations of the corporate name, it is irrefutable that the religious society now more popularly known as "St. Paul's African M.E. Zion Church of Willow Street" has maintained an uninterrupted existence since 1844.
It is equally indubitable that the founders of this society intended it to pursue the faith of the Methodist Episcopal persuasion and be obedient to its discipline, and I might add that doubless they expected that the trust they confided to posterity would be faithfully executed. The doctrines and discipline prescribed by the General Conference of The African Methodist Episcopal Zion Church in America, as elicited from the published exposition of them, conspicuously resemble those of the Methodist Episcopal Church of the white *Page 189 
race in England and America. The duty of the bishop to assign the preachers to their respective charges is distinctly Methodistic.
Although the local society was formerly associated with the Wesleyan organization, it is conceded that for many years last past the society has been affiliated with the African M.E. Zion Church of America and has conducted its spiritual and temporal affairs in subordination to the government and discipline of that mother church.
The rebellious measures to which the defendants have attempted to resort are inspired by their disinclination to receive the preacher appointed for their congregation by the bishop at the last annual conference. Their insistence is that the appointment of the bishop must be ratified and approved by the members of the society to which the pastor is appointed, and that the admission of the nominated pastor to the local church is optional with its members.
This court will not encroach upon the available jurisdiction of the court of law to determine the mere right to the office of pastor of a corporate religious society. This court will however intervene where a church building is wrongfully closed against members of the association who are cestuis que trust for whom the property is held in trust.
It is obvious that the latitude of the bishop's power of appointment is the subject predominately pervading the minds of these litigants. A desire to allay the present agitation induces me to comment on the subject. The question, although not notable in recent years, is by no means novel to the Methodist Episcopal denomination whose history began more than two centuries ago. The founder, John Wesley, embraced the so-called "itinerancy" of the preachers as a cardinal principle of his evangelistic movement. He firmly believed that the preachers whom he accredited to diffuse his doctrines should possess an assurance of independence from the people whose sins they were to condemn and whose consciences they were to awaken and that they should serve their congregation for brief periods not exceeding three years, thus to avoid alliances and allurements ordinarily incident to a permanent residence. The duty of assigning the preachers *Page 190 
was, in the early years, exercised by Wesley himself, in England and indeed in this country.
The first regular itinerant Methodist preachers visited this country in 1769. Two years later Francis Asbury arrived, to whose zeal and indefatigable exertions Methodism in America owes its excellent organization and miraculous growth. In 1784 the several societies were united and Asbury was chosen bishop. Articles of religion were declared; church discipline was established conferring upon the bishop the duty of appointing preachers and presenting them to the congregations. It is evident that Bishop Asbury continued to station the preachers in this country until his death in 1816. So far as I am informed, the itinerancy of the clergy, enforced by the power of the episcopacy, has ever since been the well-established practice of that church. My attention has not been conducted to a declaration in the negative from any authoritative source.
I previously intimated that the wisdom of the practice had been heretofore debated in the councils of the church. Research exposes accounts of the controversy which occurred in England in 1789 distinguished by the name "The Case of Birstal House." Wesley related: "I built the first Methodist preaching house at Birstal, in 1739, and knowing no better I suffered the deed of trust to be drawn up in the Presbyterian form, but Mr. Whitefield hearing of it, wrote me a warm letter asking, `Do you consider what you do? If the trustees are to name the preachers they may exclude even you from preaching in the house you have built. Pray let this deed be immediately cancelled.'" To this the trustees readily agreed. Subsequently he said that "I built the preaching houses in Kingswood and at Newcastle-upon-Tyne. But none besides myself had any right to appoint the preachers in them." He also commented that "whenever the trustees exert the power of placing and displacing preachers, then itinerancy preaching is no more. When the trustees in any place have found and fixed a preacher they like, the rotation of preachers is at an end; at least till they are tired of their favorite preacher, and so turn him out. While he stays, is not the bridle in his mouth? How does he speak the full *Page 191 
and the whole truth, since whenever he displeases the trustees he is liable to lose his bread? How much less will he dare to put a trustee, though ever so ungodly, out of the society?" And in 1782 he used this explicit language: "I abhor the thought of giving to twenty men the power to place or displace the preachers in their congregations. How could he then dare to speak an unpleasing truth? And if he did what would become of him? This must never be the case while I live among the Methodists. And Birstal is a leading case, the first of an avowed violation of our plan. Therefore the point must be carried for the Methodist preachers now or never; and I alone can carry it, which I will, God being my helper."
In this country in which the avidity for self-government was so intense, it was not strange that efforts should be initiated to overthrow or modify the power thus bestowed on the bishop. The subject was controversially debated at general conferences on many occasions during the first fifty years of the nineteenth century but the practice was again and again successfully defended. It is this intrinsic principle of the government of the Methodist Church that these defendants and their associates are attempting to evade.
The African Methodist Episcopal Church was organized in 1816. It adopted the doctrines and, with some unessential modifications, the discipline and governmental rules of the Methodist Episcopal Church. The African Methodist Episcopal Zion Church with which the society of these litigants is affiliated was constituted in America in 1820. I discover in its published "Doctrines and Discipline" (1940 edition) that among the duties of the bishop is that of annually appointing the preachers to charges. He is also admonished that "He shall allow a Preacher to remain in a Charge four consecutive years, provided, in his judgment, it is best; but no longer, unless he is building a Church or Parsonage or engaged in paying off some heavy Church debt; he then may allow him to stay long at his discretion. Provided, however, that this rule does not refer to Preachers in Foreign Fields."
I am unable to perceive any reason to doubt the power of the bishop to appoint the pastor to officiate in the St. Paul's *Page 192 
Church. My notice has not fallen upon any disciplinary provision or custom from which it can be suspected that his power to do so is contingent upon the formal approval of the members. Therefore as Methodists, the defendants and their friends should discreetly yield to the long-established government and discipline of the church rather than manifest their immediate displeasure by capriciously usurping an unwarranted dominion over the church property. The engendering of strife and discord is incompatible with the unity and harmony which should characterize the unmolested pursuit of religious worship by all the members of the local society. I remind them that although the colored congregations of these Methodist denominations always have been denied the power to choose or reject their pastor or preacher, yet the membership of the African Methodist Episcopal Church has increased to about one-half million (1936) and that of the African Methodist Episcopal Zion Church to more than 400,000.
I come now, perhaps somewhat belatedly, to the consideration of the conduct of the defendants in its relation to the rights of the complainants and other members to the use of the church for the purposes to which it was dedicated. The defendants have not disavowed their attempts to close the church against Mr. Skinner, the duly appointed pastor. They supposed they were acting in accordance with the wishes of the majority of the members. The evidence discloses occasions when the pastor and several members assembled at the church, finding the doors securely locked, and they were obliged either to disperse or conduct services at the residence of one of the members.
If the defendants assumed to employ the authority of elected trustees, I am unable to discover any express or implied authority for such action in anything appertaining to the maintenance and government of the church. As trustees they held the property subject to its appropriate use. The closing of a church is in effect a diversion of its use.
I am told that although there are approximately 200 members enrolled, yet of them 75 to 80 members supply the requisite pecuniary support for the maintenance of the church. *Page 193 
Among them, however, are the complainants and others who insist that the church building remain open. The trustees did not possess the authority to close the meeting house at their discretion either under the deed of conveyance or under the discipline of the church. The name of the society exhibits its character and connection.
It was held in American Primitive Society v. Pilling,24 N.J. Law 653, that a congregation or inferior ecclesiastical corporation which, by its organization, is connected with and subject to the superior jurisdiction of the church to which it belongs, cannot, even by the act of the majority, declare themselves independent and take the corporate property with them. Assuredly this is just, so long as there remains a body of members who continue to be loyal to the superior organization.
It was resolved in True Reformed Dutch Church of Paramus v.Iserman, 64 N.J. Law 506; 45 Atl. Rep. 771, that as between two opposing factions of a religious association, land acquired by the association before any schism arose, will remain the property of that faction which abides by the doctrines, principles and rules of the church government which the united body professed. In such circumstances, if secession is undertaken by a faction, however large or however small, such faction will not be permitted to carry away, so to speak, the church property with it. Significantly, this local church has received pecuniary assistance from the superior organization to which it is connected.
The established facts warrant equitable relief. Morgan v.Rose, 22 N.J. Eq. 583; Whitecar v. Michenor, 37 N.J. Eq. 6;Everett v. Trustees of Church, 53 N.J. Eq. 500;32 Atl. Rep. 747; Barna v. Kirczow, 71 N.J. Eq. 196; 63 Atl. Rep. 611;Grupe v. Rudisill, 101 N.J. Eq. 145; 136 Atl. Rep. 911. I shall advise a decree enjoining the defendants to desist and refrain from closing the church or otherwise preventing the preacher, Mr. Skinner, and the members of the society from using it for the purposes of religious worship or for the transaction of the temporal business of the church. *Page 194