89 N.J. Super. 65 (1965)
213 A.2d 651
ST. JOHN'S GREEK CATHOLIC HUNGARIAN RUSSIAN ORTHODOX CHURCH OF RAHWAY, NEW JERSEY, A CORPORATION OF THE STATE OF NEW JERSEY, ALSO KNOWN AS ST. JOHN THE BAPTIST RUSSIAN ORTHODOX GREEK CATHOLIC CHURCH, REVEREND THEOPHIL D. KREHEL, RECTOR OF ST. JOHN'S GREEK CATHOLIC HUNGARIAN RUSSIAN ORTHODOX CHURCH OF RAHWAY, NEW JERSEY, SIMEON FINZELL AND EUGENE ALESHIN, TRUSTEE AND AUDITOR, RESPECTIVELY, OF ST. JOHN'S GREEK CATHOLIC HUNGARIAN RUSSIAN ORTHODOX CHURCH, JOHN WANKO, IRENE ALLEN, JOSEPH MAGDA, HELEN MAGDA, MARY KAMINSKY, HELEN MEHALICK, STEPHEN MEHALICK, AL BABICH, HELEN BABICH, HELEN NICHOLAS, MILDRED STEPICH, MICHAEL STEPICH, EUGENE ERWINSKI, ALICE ERWINSKI, AND GEORGE SEKEL, PLAINTIFFS,
v.
MICHAEL FEDAK, MICHAEL SUDIA, JOHN PETRONKO, SR., WILLIAM WANKO, EDWARD GOLINSKI, MARY KAPPEL, MARY KOCHAN, MICHAEL PETRIN, ANTHONY VANUK, ALEXIS MOCKOS, MICHAEL ZSIDISIN, THOMAS RUSTICK, AND PHILIP YURCHUK, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided September 30, 1965.
*67 Mr. Paul R. Williams, Jr. for plaintiffs (Mr. Dominick A. Mirabelli, attorney).
*68 Mr. Philip Adler of the New York Bar for defendants (Mr. Edward Feld, attorney).
MINTZ, J.S.C.
This is an action to determine, inter alia, the right to the use and control of church property. In essence, this case involves a schism among the membership of St. John's Greek Catholic Hungarian Russian Orthodox Church of Rahway, New Jersey (hereinafter referred to as St. John's). Plaintiffs contend that St. John's is an integral part of the Russian Orthodox Greek Catholic Church of America (hereinafter sometimes referred to as the Metropolia) and that the faction loyal to this body is entitled to the use and control of the property in question. Conversely, defendants claim that St. John's is not and has never been an integral part of the Metropolia and that the parish by majority vote may sever whatever ties it has with the Metropolia and join another jurisdiction. They further urge that Reverend Krehel, the pastor assigned to St. John's, was properly dismissed.
This dispute arose out of conflict between Reverend Krehel, the pastor of St. John's, and most of the elected officials of the parish. Reverend Krehel was assigned to St. John's by the Metropolia on February 24, 1958. His appointment was in response to a recommendation made by the St. John's church committee and obviously met with the approval of the parish, though there is some dispute whether a formal vote approving his appointment was taken.
Friction between the parties began in 1960 when Reverend Krehel offered the 1955 statutes of the Metropolia to the parish for their approval. Despite his support of the statutes, the parish refused to pass a resolution accepting them. The parish found objectionable the extent of clerical supervision of parish affairs granted by article VI of the statutes. This issue of the statutes continued to be a source of dissension between the parties.
Events came to a head starting in the latter part of 1963 when certain of the defendants became increasingly dissatisfied *69 with Reverend Krehel's rectorship. On at least two or three occasions in November and December of 1963 a group of delegates from St. John's appeared before representatives of the Metropolia in New York and petitioned, in vain, for Reverend Krehel's removal.
In January 1964 Reverend Krehel sent a list of St. John's newly elected officers to the bishop of the diocese for confirmation. He called attention to the fact that five of the officers were not qualified for office under the Metropolia statutes. The bishop confirmed all but the five and sent the pastor a copy of an oath to be administered to the officers. The officers objected to the oath because of a clause requiring conformity to the statutes of the Metropolia. In addition, certain officers objected to having to take the oath each year of a term of two years. This controversy was accompanied by a great deal of argument and bitterness. The result was that the five excepted officers were confirmed after they reluctantly complied with the religious qualifications required by the statutes. The Metropolia authorities insisted that the oath be taken every year regardless of the officer's term of office. Some of the officers took the oath, others merely mouthed it, and some did not take it at all.
On March 24, 1964 the Chancellor of the Metropolia circulated a resolution among the New Jersey parishes denouncing participation in a so-called President's Club. This was an organization made up of members of various parishes which met to discuss their mutual problems. Apparently, the bishops thought this organization was usurping power and handling matters properly within the scope of the hierarchy. By a bulletin circulated on May 28, 1964 the officers of St. John's parish called a special meeting to be held on June 7, 1964 to get approval from the parishioners to continue their association with the President's Club. The hierarchy declared this proposed meeting unlawful and directed the pastor and the parishioners not to attend. The meeting was held as scheduled. The minutes make it clear that those in attendance had become displeased with the amount of control the hierarchy *70 was exercising over local affairs. By secret ballot, two motions were carried by a vote of 62 for and none against. The first motion was to empower the church committee to continue to conduct the parish affairs, which, in essence, was a vote of confidence. The second motion empowered the church committee to seek legal advice, with the church as a whole bearing the expense.
On June 11, 1964 the hierarchy declared all of the actions of this June 7 meeting to be void and resolved to summon all those concerned to appear before the Diocesan Ecclesiastical Court to answer charges. On June 15 the officers sent a letter to the parishioners thanking them for their vote of confidence and informing them of the regular semiannual meeting to be held on July 12, 1964.
The parish meeting was held on the date so fixed. After discussion of their dissatisfaction with the Metropolia, a motion was made to disaffiliate. Reverend Krehel protested that this meeting was incompetent to take such a step, but the motion was carried. According to the minutes of the meeting, 52 secret ballots were cast, with 33 in favor of the motion. The church committee was instructed to investigate the possibilities of joining another orthodox jurisdiction.
On September 6, 1964 the church committee notified the congregation by bulletin, which announcement was subsequently repeated weekly, that a special parish meeting would be held on September 20, 1964 for the purpose of voting on the committee's report on the "new Orthodox jurisdiction."
In the meantime, an order to show cause issued out of the Diocesan Court of the Metropolia on September 11, directing each of the defendants to show cause why he should not be suspended from his office. The hearing was set down for September 17, 1964 at 2 P.M. At this point defendants secured legal counsel for the first time. Counsel, desiring to secure time to investigate, sought a postponement of the hearing. In face of the impending church meeting, the Diocesan Court felt it urgent to hold the ecclesiastical hearing as scheduled. Thus, upon defendants' defaults, the Diocesan Court suspended *71 them from office and granted Reverend Krehel extraordinary powers to carry on the proper functions of the parish.
Reverend Krehel denounced the special meeting proposed for September 20. From the pulpit he admonished the members not to attend the unauthorized meeting. However, the meeting was held and the church committee reported that they could not resolve their differences with the Metropolia. A motion was made to disassociate from the Metropolia and to join the jurisdiction of Bishop Charnock. By secret ballot the motion was carried 72 votes for and 4 against. St. John's has between 250 and 300 members eligible to vote. A motion was also carried to give Reverend Krehel 30 days' notice of termination of his services. Thereafter, this action was commenced. While a hearing was pending upon plaintiffs' application for an interlocutory injunction, the Diocesan Court excommunicated all the defendants ex parte.
The plaintiffs are the pastor, a trustee, auditor and several other individuals said to be members of the parish. In addition, the church corporation is a named plaintiff, although the remaining 13 officers and trustees of St. John's are defendants. Defendants strongly urge that St. John's, a corporate body, is not a proper party plaintiff and should have been joined, if at all, as a party defendant. The elected officers and trustees of St. John's (allegedly suspended from office by the Metropolia) did not authorize the joinder, nor did the membership at large. There may be merit to this argument, but the error, if any, is not significant. The essential fact is that St. John's is an indispensable party to these proceedings, has been given the requisite notice, and will be bound by the judgment to be entered herein.
The complaint seeks to enjoin the defendants from interfering with the affairs of St. John's by acting as officers and members thereof. It further seeks a declaration that Reverend Krehel is St. John's rightful pastor and to have the books, records and bank accounts turned over to him and the other plaintiffs as the persons properly entitled to their possession. *72 Defendants counterclaim for injunctive relief protecting their position as the duly elected officers of St. John's and restraining Reverend Krehel from acting as the parish priest, claiming he was dismissed by a valid vote of the parish.
There was considerable testimony presented on the history of the Russian Orthodox Church and of the Metropolia. It will not be necessary at this time to set forth a detailed account of this history, as it has already been extensively spread upon the law books of this and other jurisdictions. See, e.g., Ryszko v. Kaimakan, 108 N.J. Eq. 34 (Ch. 1931), and St. Nicholas Cathedral of Russian Orthodox Church v. Kedroff, 302 N.Y. 1, 96 N.E.2d 56 (Ct. App. 1950); Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952).
The Metropolia was organized in 1924 at a sobor (convention) held in Detroit, with some 115 of approximately 300 Russian Orthodox Churches in America in attendance. Since 1917 the status of the Russian Orthodox Church in America had been quite unsettled due to political conditions in the Soviet Union. It was in response to these pressures that the separate Russian Orthodox Greek Catholic Church of America (Metropolia) was organized as an autonomous body with Platon as its Metropolitan or head. The Metropolia does claim orthodoxy based upon the actions of a sobor of the mother church held in Moscow in 1917-1918 and the Ukase of Patriarch Tikhon, No. 362 of November 20, 1920. There have continued to be competing Russian Orthodox jurisdictions in America.
Clearly, from the testimony adduced, it appears that the Metropolia is a hierarchically structured church. "Hierarchical churches may be defined as those organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head. * * *" Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, supra, 344 U.S., at p. 110, 73 S.Ct., at p. 151.
Superior church authority rests in the All America Sobor, a periodic convention of the clergy and laity of the entire *73 church. The sobor passes on all church matters, but the bishops must approve all resolutions. The sobor elects the Metropolitan whenever a vacancy in that office occurs, subject to the approval of the bishops. The Metropolitan is the highest ranking official of the church and its spiritual leader. The Metropolitan is assisted administratively by the Metropolitan Council and the Bishops Sobor. The Bishops Sobor is the supreme ecclesiastical authority and supervises church-related schools, seminaries and colleges.
The basic constituent level of the Metropolia is the diocese governed by a bishop. The bishop is assisted administratively by a diocesan assembly, a body composed of representatives of clergy and laity which meets periodically to discuss and decide problems of the diocese. The diocesan assembly elects a diocesan council as the permanent administrative body of the diocese. The diocese is further subdivided into deaneries presided over by a dean dealing directly with the parishes.
The parish is the smallest component and the lowest level of the hierarchy. Parish affairs are governed by laymen elected as officers, but all its actions are supervised by the pastor as the representative of the hierarchy. Confirmation by diocesan authority is required as to most parish decisions. It is clear from the statutes and organizational structure of the Metropolia that each member parish is but a part of a whole, is subject to the authority of the hierarchy, and its property is held for the use and benefit of those who adhere to the doctrine, discipline and worship of the Russian Orthodox Greek Catholic Church of America.
Initially, it may be observed that N.J.S.A. 16:15A-1 et seq. purports to determine by legislative fiat that the Metropolia is the entity having jurisdiction over every Russian Orthodox Church in this State. Plaintiffs, however, do not rely upon this statutory authority in the light of its dubious constitutionality, Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, supra, and this court does not pass upon the same. Instead, plaintiffs contend that St. John's parish is an integral member of the Metropolia and that a part of the *74 parish membership cannot, without the approval of the Metropolia, divert the property of the parish to the use or control of some other jurisdiction. Defendants claim this is not the status of the law and, in any event, St. John's is not an integral part of the Metropolia.
In Watson v. Jones, 13 Wall. 679, 80 U.S. 679, 20 L.Ed. 666 (1872), the court had occasion to consider the role that courts ought to play in church disputes. It classified three basic ways in which church property may be held: (1) by religious societies subject to an express trust under an instrument; (2) by religious societies congregational and autonomous in organization; and (3) by religious societies which form a part of a larger, general church organization. Regarding the third form of property ownership, the court held that the decisions of the highest authorities in the church organization as to the question of discipline, faith and ecclesiastical rule, custom and laws are binding on the courts.
As to the third classification in Watson v. Jones, supra, where property is devoted to a particular ecclesiastical organization, a majority cannot secede from that organization and transfer the property to another use. American Primitive Society v. Pilling, 24 N.J.L. 653 (Sup. Ct. 1855); True Reformed Dutch Church v. Iserman, 64 N.J.L. 506 (Sup. Ct. 1900); Presbytery of Jersey City v. First Presbyterian Church, 80 N.J.L. 572 (Sup. Ct. 1910); Schilstra v. Van Den Heuvel, 82 N.J. Eq. 155 (Ch. 1913), modified on other grounds 82 N.J. Eq. 612 (E. & A. 1914); Karoly v. Hungarian Reformed Church, 83 N.J. Eq. 514 (Ch. 1914), affirmed 84 N.J. Eq. 203 (E. & A. 1914); Grupe v. Rudisill, 101 N.J. Eq. 145 (Ch. 1927); Kelly v. McIntire, 123 N.J. Eq. 351 (Ch. 1938); Mathis v. Holmes, 134 N.J. Eq. 186 (Ch. 1943). For cases in other jurisdictions, see 45 Am. Jur., at p. 778. The court in Kelly, supra, reviewed the existing authorities and concluded that:
"The principle seems to be firmly established that a congregation belonging to a religious denomination and subject to the constitution, *75 faith, and doctrines thereof cannot use its property for a purpose other than that sanctioned by the denomination. * * *" (at p. 361)
The right to secede from a parish is uncontestable, but seceders cannot, no matter how large a majority, dedicate the use of the church property to another ecclesiastical jurisdiction.
The defendants rely upon Pulis v. Iserman, 71 N.J.L. 408 (Sup. Ct. 1904), where secession was permitted. However, there the court stressed the fact that the vote to secede was unanimous and that the tenets of the hierarchical organization did not prohibit such secession. This latter proposition seems doubtful, but the court did state it as a reason for allowing secession. Another case defendants rely upon is Vargo v. Vajo, 76 N.J. Eq. 161 (Ch. 1909), in which secession also was allowed. Again, secession was decided upon by a unanimous vote of the congregation. Significantly, the court expressly found that it was not dealing with a hierarchical form of government, but with a congregational relationship where clearly secession is permissible.
The cases previously cited seem to indicate that Pulis v. Iserman, supra, should be limited to its facts. The language used in Karoly v. Hungarian Reformed Church, supra, is typical:
"* * * but no number, however great the majority may be, has the right to secede and take the church property with it to the new affiliation, so long as there remains a faction which abides by the doctrines, principles, and rules of the church government which the united body professed when the land was acquired. * * *" (83 N.J. Eq., at p. 520; emphasis added)
Another issue in this case, besides the right of secession and control of church property, is whether the majority, or the trustees acting in behalf of the majority, can reject the pastor assigned by the Metropolia. Whitecar v. Michner, 37 N.J. Eq. 6 (Ch. 1833), holds that a majority of a congregation which is a member of a hierarchy cannot dismiss the pastor against the wishes of the hierarchy. Mathis v. Holmes, supra, concerned a case where the majority of the congregation *76 locked the doors on the pastor appointed by the hierarchy. The court reviewed the structure of the hierarchy, found that the hierarchy normally appointed pastors of the local parish, and held that in such a hierarchical relationship the majority could not lock out the pastor.
Everett v. Trustees of First Presbyterian Church, 53 N.J. Eq. 500 (Ch. 1895), relied upon by the defendants, is distinguishable. Representatives of the Presbyterian Church sought to oust a minister from the parsonage of a local church. Previously, the minister was relieved of his church post by the hierarchy, but remained in the parsonage. The court held that the parsonage, as distinguished from the church property, was mere real property and as such outside of the spiritual domain of the Presbytery. The case sub judice concerns an attempted separation to a new church affiliation as well as dismissal of the pastor. Even in Everett it was recognized that the hierarchy had control of the pulpit. And Everett did not concern an attempt to affiliate with a different religious organization. Also, whether rightly or wrongly, the court in Everett characterized the Presbytery as a voluntary association of church societies rather than a hierarchy as is the Metropolia. Under such circumstances Everett lends no support to defendants.
It is urged that this court should not determine the right of Reverend Krehel to hold office as pastor. Normally, the mere right to hold office should be determined in a court of law. Mathis v. Holmes, supra. However, where, as here, equity jurisdiction has attached, the cause will be retained to finally determine the entire controversy, including purely legal rights and the granting of legal remedies. Steiner v. Stein, 2 N.J. 367 (1949); R.R. 4:41-2.
As already observed, the Metropolia is hierarchical. No part of a member parish of such an organization is free to secede and use the church property for the benefit of another jurisdiction. What remains is to determine whether or not St. John's is an integral member and, as such, bound to the Metropolia.
*77 St. John's was founded in 1915 and incorporated in 1916 under the General Religious Society Act of 1875. St. John's did not participate in the 1924 sobor which organized the Metropolia, and never formally dedicated itself to the Metropolia. Article VI of the statutes of the Metropolia adopted at a sobor in 1955 indicates that a resolution must be passed before a parish can become a member of the Metropolia. However, this rule was meant to apply to new members and not to those already considered members due to long association with the organization. The fact that there was no explicit or formal acceptance of the Metropolia hierarchy is not determinative, as such a relationship may be inferred from the facts of each case. American Primitive Society v. Pilling, supra. In Pilling the court said:
"* * * In my opinion, no written constitution or positive agreement to continue under the government of the conference was needful. I am not aware that other denominations of Christians in this state, whose societies are incorporated by virtue of the general act, have usually such constitutions. Their connection with the ecclesiastical authorities having the rule over them, is inferred from the circumstances of each case. It was so in the case of Den v. Bolton, and in the much litigated case of Hendrickson v. Decow, Sax, 577, involving the legal effect of the division in the Society of Friends. A similar doctrine has been held in the case of Harmon v. Dreher, 1 Speer Eq. R. 87; German Reformed Church v. Com., 3 Barr. 282; Baker v. Fales, 16 Mass. R. 503; The People v. Steele, 2 Barb. S.C.R. [397] 399." (24 N.J.L., at p. 657)
Other jurisdictions have taken the similar approach in cases of this sort of looking at the history of the relationship of the parties to determine if a parish has become an integral member. The Russian Orthodox Greek Catholic St. Peter and St. Paul's Church of Lorrain, Ohio v. Burdikoff, 117 Ohio App. 1, 189 N.E.2d 451 (Ct. App. 1962), certiorari denied 374 U.S. 808, 83 S.Ct. 1694, 10 L.Ed.2d 1033 (1963); Browning v. Burton, 273 S.W.2d 131 (Tex. Civ. App. 1954); United Armenian Brethren Evangelical Church v. Kazanjian, 322 Mich. 651, 34 N.W.2d 510 (Sup. Ct. 1948); Chrapko v. Kobasa, 271 Pa. 447, 114 A. 254 (Sup. Ct. 1921). Burdikoff *78 is particularly significant since affiliation was there found even though the parish antedated the formation of the Metropolia and no formal dedication occurred.
The early history of St. John's church indicates that they had a great deal to do with Platon, even before he became the first Metropolitan of the Metropolia. There was evidence in the parish minutes of a vote at the annual meeting in 1923 to deed some undisclosed church property to Platon, but there is no record of any such deed. However, in the light of such a close relationship, it is not strange that the parish would continue to seek Platon's guidance after he was instrumental in the formation of the Metropolia.
Since 1927 all the priests of St. John's parish have come from the Metropolia. Before this the parish had some nine priests in a 12-year period. From 1927 to date there have been only six priests, indicating how the Metropolia has helped stabilize the parish. The fact that priests were secured from the Metropolia is a good indication of affiliation. The Russian Orthodox Greek Catholic St. Peter and St. Paul's Church of Lorrain, Ohio v. Burdikoff, supra; Browning v. Burton, supra; Chrapko v. Kobasa, supra.
Other facts were offered to prove the relationship with the Metropolia. Dignitaries of the Metropolia visited the parish both for ceremonial and social purposes. Specific proven examples include a 1927 visit by Platon to bless the newly built rectory, and a 1960 visit of the Diocesan Archbishop for a special pontifical service. In turn, members of the parish visited Metropolitan Leonty's Long Island residence and St. Tikhon's Seminary and Monastery in Pennsylvania.
St. John's participated in various sobors of the Metropolia. Their representatives attended in 1937 and 1946. In 1953, in response to a Metropolia questionnaire, St. John's, through its officers, responded, "That our parish considers it important to the welfare of our church to call the 9th All America Church Sobor in 1954, as proposed by our sobor of Bishops." The sobor was held in 1955 and St. John's sent a participating delegate. Likewise, in 1959 and 1963 members *79 of St. John's attended and participated in the sobors. As to the 1963 sobor, the minutes of the parish include an authorization for payment of $35 to cover their assessed share of the sobor costs. After the sobor, two of the defendants who were in attendance reported favorably to the parish on some of the events. Such participation in the Metropolia government is substantial evidence of affiliation.
The parish made periodic financial payments to the Metropolia. As late as January 1964, while the defendants were the officers of St. John's, the membership voted to add $1 to each parish member's dues to pay the annual assessment to the Metropolia. St. John's annual financial statements include numerous items which are directly attributable to their affiliation with the Metropolia. Defendants try to dismiss these as mere charitable contributions and of no probative value. However, it is significant that St. John's has always chosen to support Metropolia charities, and it does appear in the parish minutes that some of those "contributions" were considered by the membership to be required assessments.
As late as June 1963 the parish of St. John's sought hierarchical approval of its plans to build a new church edifice. A meeting was arranged to show the bishop and the chancellor of the diocese the architect's plans. A letter was sent to Metropolitan Leonty asking his blessing on the proposed construction. This was in accord with the statutes of the Metropolia, article VI, section 24.
In January 1964 Reverend Krehel sent the list of the newly elected officers of the parish to the Metropolia for approval. It was determined that certain of the defendants could not be confirmed as officers until they became religiously qualified and took the oath of office. There is some dispute whether all the defendants ever actually took the complete oath of office, but it cannot be denied that the religious requirements were followed and that some outward compliance to the hierarchy was manifest.
Even during this dispute, some of the defendants indicated their allegiance to the hierarchy, for they petitioned the *80 bishop to remove Reverend Krehel as pastor of St. John's. It was not until they exhausted the Metropolia's procedure for removal of a priest that the defendants claimed their independence from the Metropolia.
Since 1927 the parish of St. John's has followed the tenets, discipline, customs and mores of the Metropolia. At every mass and sacrament allegiance to the ruling archbishop is declared. These 37 years of compliance with the spiritual leadership of the Metropolia must be considered as a factor tending toward affiliation. See Russian Orthodox Greek Catholic St. Peter and St. Paul's Church of Lorrain, Ohio v. Burdikoff, supra; Browning v. Burton, supra. Over these 37 years St. John's received contributions from parishioners while holding itself out as a member of the Metropolia.
The defense introduced evidence attempting to prove that the Metropolia was not "canonical." Apparently, the argument is that if the Metropolia is not "canonical," then St. John's parish is free to secede whenever it wishes. This argument is without merit. This court should not rule upon the question of canonicity, a religious issue. The crucial determination is whether there is affiliation with an autonomous hierarchical organization with a colorable claim to orthodoxy. Ryszko v. Kaimakan, 108 N.J. Eq. 34 (Ch. 1931). The Metropolia is a member of the World Council of Churches, an organization of autonomous church bodies. As observed in Burdikoff, 117 Ohio App. 1, 189 N.E.2d 451, at p. 453, "The Patriarch of Moscow has brought the Russian Orthodox Church into the World Council of Churches, thereby recognizing the Metropolia as an autonomous church." In addition, as Burdikoff indicates, the defendants cannot now, after 37 years of association, claim that they are free of that association because the Metropolia is uncanonical.
Defendants claim that the parish was governed by its own bylaws and that this is inconsistent with affiliation and control by the Metropolia. There is nothing inconsistent in a parish having bylaws and being a constituent of a hierarchical body. Nothing in the statutes of the Metropolia precludes *81 the same. In fact, in order that church objectives be carried out, the statutes of the Metropolia direct each parish to adopt rules and regulations not inconsistent with the superior body of rules. The defense did not prove that any of the bylaws substantially conflict with the rules of the Metropolia.
Their only contention in this regard is that the bylaws give the parish the power to dismiss the pastor, which is inconsistent with the statutes of the Metropolia. The pertinent bylaw provisions are:
"27. The priest-pastor shall obey the By-Laws of this congregation. If the priest causes disruption and misunderstanding, or premeditately causes harm to the church or congregation and does not fulfill his pastoral duties, then the members can complain of his actions to the Bishop and ask for his removal.
28. The priest-pastor cannot, of his own will, leave this charge, without giving an advance 30 day notice to the members of the congregation, and the congregation also cannot remove the priest without giving him a 30 day notice in advance."
An attempt is made to read the last clause of bylaw 28 as giving the parish the power to remove the priest. This is not the case. The procedure for removal is set forth in paragraph 27. Paragraph 28 concerns notice; that is, what notice a priest must give if he is transferred by the Metropolia or retires, and what notice the parish must give the priest if it secures his removal through the procedures set forth in bylaw 27. These paragraphs do not support defendants' contention that the tenure of St. John's priests was at the will of the parish congregation. Since 1927 no instance was proven where the priest was removed or engaged without the approval of the Metropolia authorities. The evidence shows that parish votes were taken on acceptance and rejection of priests, but this is not inconsistent with hierarchical control. These were attempts to insure harmony and advisory in nature. In every instance, except the present dispute involving the tenure of Reverend Krehel, the Metropolia, in practice, acceded to the wishes of the congregation as expressed by their votes.
*82 In fact, the by-laws of St. John's parish tend to support plaintiffs' claim of affiliation. As presently codified, the bylaws were adopted by the parish in 1932. Evidence was offered that bylaws existed prior to this date. At any rate, it is clear that when these bylaws were adopted St. John's had no relationship at all with any other hierarchical body except the Metropolia. Hence, any reference therein to a superior authority necessarily refers to the Metropolia. Paragraph 3 states:
"The above named Church is under the spiritual jurisdiction and in spiritual matters under the authority of the lawful governing Archbishop of the Russian Orthodox Church in America."
In a similar manner, paragraph 30 indicates that affiliation was contemplated, since the office of the Dean (obviously referring to a Metropolia Deanery) is utilized to facilitate the transfer of control of the parish documents when a pastor is changed.
The defendants also attempt to rely upon the facts that the parish rejected the statutes of the Metropolia adopted in 1955 as showing their independence. In 1960 the statutes were first presented to the parish for their approval and the parish voted to reject the statutes "until revised." In May 1963 the parish church committee, of which some of the defendants were members, sent a resolution directed to the 10th All America Sobor of the Russian Greek Catholic Church of America. This resolution expressed the parish's displeasure with article VI of the statutes and its recommendation for revisions. The "whereas" clauses of the resolution emphasized that "The parishioners of St. John The Baptist Russian Orthodox Greek Catholic Church of Rahway, New Jersey, desire to live in peace and harmony insofar as the statutes of the Russian Orthodox Greek Catholic Church of America are concerned and, therefore, would not reject all parts of the statutes"; and that they "wish to continue as members of the Russian Greek Orthodox Catholic Church of America subject to diocesan authority with regard to ecclesiastical matters." *83 All this incident establishes is that St. John's was unhappy with the amount of clerical supervision of parish affairs, but does not prove that St. John's was independent of the Metropolia. The attempts to secure revision and the language of the resolution indicate that affiliation was a fact.
The totality of the evidence establishes that St. John's is an integral part of the Metropolia. While the history of St. John's shows there has been some opposition to hierarchical supervision especially since 1960, the proofs establish affiliation of St. John's with and under the jurisdiction of the Metropolia. The defendants will be restrained from appropriating the church property to the use of another ecclesiastical jurisdiction and from interfering with Reverend Krehel in the performance of his priestly duties.
The defendants ask that their excommunication by the Metropolia be set aside. This is a matter of church discipline in which the court is powerless to interfere. Watson v. Jones, supra; Moorman v. Goodman, 59 N.J. Super. 181 (App. Div. 1960).
The complaint also asks that the defendants be restrained from occupying their elected offices from which they have been suspended by the Metropolia Court. Bylaw 15 provides that to be eligible to be a member of St. John's congregation, and you cannot be an officer if you are not a member of the congregation, the "regulations, laws and demands of this congregation and the Russian Orthodox rite" must be followed. As already observed, when the bylaws of St. John's were written, Russian Orthodox rite referred to the Metropolia. Therefore, excommunication by the Metropolia makes defendants, until restored to the good graces of the Metropolia, ineligible to serve as officers of St. John's parish. Accordingly, the membership of St. John's shall proceed forthwith to elect new officers and trustees to fill the unexpired terms of the offices of the respective defendants. Until this is accomplished, as a practical expedient the affairs of St. John's shall continue to be administered in accordance with the interlocutory order entered herein on November 10, 1964. In *84 light of the foregoing determinations, it is unnecessary to pass upon the validity or effectiveness of the Metropolia's orders of suspension and grant of extraordinary powers.
A form of judgment will be submitted, consented to as to form or to be settled on notice.